Luretha GADDIS, individually, on behalf of her minor children, and on behalf of all other persons similarly situated, Plaintiff,

and

Willa Jean Manning, Annie Bell McAllister and Ruth Mickle, Plaintiffs-Intervenors,

v.

George K. WYMAN, individually and as Commissioner of the Department of Social Services for the State of New York, and Louis P. Kurtis, individually and as Commissioner of Westchester County Department of Social Services, Defendants.

No. 69 Civ. 2921

United States District Court
S. D. New York.

Ossie BOWENS, individually and on behalf of all other persons similarly situated, Plaintiff,

v.

George K. WYMAN, Commissioner of the New York State Department of Social Services, and John Lascaris, Commissioner of the Onondaga County Department of Social Services, Defendants.

No. 69 Civ. 258.

United States District Court
N. D. New York.

Sept. 22, 1969.

718

The Legal Aid Society of Westchester County for plaintiff and plaintiffs-intervenors in Gaddis case; Bernard Clyne, and Antone G. Singsen, III, White Plains, N. Y., of counsel.

Onondaga Neighborhood Legal Services, Inc. for plaintiff Ossie Bowens; Richard A. Ellison, Syracuse, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York for defendant Commissioner Wyman; by Samuel A. Hirshowitz, First Asst. Atty. Gen., Maria L. Marcus, Asst. Atty. Gen., of counsel.

Gordon Miller, County Atty. of the County of Westchester, White Plains, N. Y., for defendant Commissioner Kurtis; Richard W. McAtamney, Senior Asst. County Atty., White Plains, N. Y., of counsel.

Leonard C. Koldin, Onondaga County Welfare Atty., Syracuse, N. Y., for Commissioner Lascaris.

Center on Social Welfare Policy and Law amicus curiae by Lee A. Albert, New York City; Lucy Katz, New York City, of counsel.

Before WATERMAN, Circuit Judge, and PORT* and MANSFIELD,** District Judges.

MANSFIELD, District Judge.

Plaintiffs in the above two class actions are applicants for public assistance administered by the New York State Department of Social Services pursuant to the cooperative federal-state program for Aid to Families with Dependent Chil-

* Of the Northern District of New York sitting by designation in the Southern District of New York.

** Of the Southern District of New York sitting by designation in the Northern District of New York.

dren ("AFDC" herein), Social Security Act, 42 U.S.C. §§ 601–610; N.Y. Social Services Law, McKinney's Consol.Laws, c. 55, § 343. They have at various times been refused such aid by New York State and County Social Services officials, even though otherwise eligible, because of failure to comply with § 139–a of New York's Social Services Law, which presumes that anyone applying for such assistance within one year after arrival in New York came into the state for the purpose of receiving such assistance and requires New York Social Services officials to deny such an application unless the applicant can establish "by clear and convincing proof that the purpose of his or her entry was not for the purpose of securing public assistance and care in this state."[1] In at least one case (Willa Jean Manning) free transportation back to the plaintiff's state of origin has been offered by Social Services officials pursuant to § 121 of the Social Services Law, which authorizes the State Department of Social Services, where a recipient of public assistance has

legally responsible relatives or friends willing to aid in supporting him in another state, to furnish transportation to such other state.[2]

The present class actions challenge the validity of § 139–a as violative of both the Equal Protection Clause of the Constitution and regulations promulgated by the Department of Health, Education and Welfare under the Social Security Act. The *Gaddis* complaint also attacks § 121 on the same grounds. Plaintiffs seek declaratory judgments and preliminary and permanent injunctions restraining enforcement of the laws under attack. Jurisdiction is invoked pursuant to various federal statutes, including 28 U.S.C. § 1343(3) and (4) (actions brought under 42 U.S.C. § 1983), §§ 2201 and 2202 (declaratory judgments) and § 2281 and § 2284 (3-judge district courts). Defendants have cross-moved pursuant to Rule 12(b), F.R.Civ.P., for dismissal of the *Gaddis* complaint for failure to state a claim upon which relief may be granted.

---

1. Social Services Law § 139–a.

"*Special provisions to avoid abuse of assistance and care.*

"1. Any person who shall apply for home relief or aid to dependent children within one year after arrival in this state, shall be presumed to have come into the state for the purpose of receiving public assistance or care and the social services official where application is made, shall deny public assistance and care to such applicant unless such applicant shall establish by clear and convincing proof that the purpose of his or her entry was not for the purpose of securing public assistance and care in this state. In addition to complying with the foregoing provisions, the applicant shall also submit with his or her application a certificate from the appropriate local employment office of the State Department of Labor issued within a two week period from the date of his or her application stating that such employment office has no order for an opening in part-time, full-time, temporary or permanent work of any kind to which the applicant could properly be referred by such office, taking into consideration only his or her physical and mental capacity without

reference to his or her customary occupation or acquired skill.

"2. The social services official shall in every case complete his investigation and make his determination of the application under this section not more than thirty days after receipt of the application."

2. Social Services Law § 121.

"*Removal of persons to another state or country.*

"1. When any person who is cared for at the expense of the state or of any public welfare district has settlement or residence or otherwise belongs to or has legally responsible relatives able or friends willing to undertake the obligations to support him or to aid in supporting him in any other state or country, the department may furnish him with transportation to such state or country, provided, in its judgment the interest of the state and the welfare of such person will be thereby promoted.

"2. The expense of such removal shall be paid from the state treasury on the audit and warrant of the comptroller pursuant to a verified account submitted by the department."

Pursuant to Rules 23 and 24, F.R.C.P., three additional plaintiffs (Willa Jean Manning, Annie Bell McAllister and Ruth Mickle) were permitted to intervene as named plaintiffs in the *Gaddis* action after an issue was raised as to the standing of Luretha Gaddis to sue and represent the class in the action instituted by her. See district court decision filed August 7, 1969, 304 F.Supp 713. Since both lawsuits raise identical constitutional questions of substance, we were appointed a three-judge district court in each case pursuant to 28 U.S.C. § 2281, and, with a view to avoiding duplication of effort, the actions were consolidated for purposes of hearing and determination.[3]

For the reasons hereinafter stated plaintiffs' motion is granted as to § 139-a and denied as to § 121; and defendants' motion to dismiss the *Gaddis* complaint insofar as it seeks to attack § 121 is granted.

The essential facts relevant to the legal issues before us are not in dispute. Each of the five plaintiffs is an indigent mother of dependent children who moved to New York from another state and within one year after establishing residence in New York applied to the Department of Social Services in the county of her newly established residence for public assistance pursuant to the AFDC program. Applying § 139-a defendants denied such assistance, the denial in the case of Annie Bell McAllister following a period of several months during which assistance payments were made to her. In the case of Luretha Gaddis, such assistance was denied in May and June, 1969, since which time payments have been made. More detailed facts with respect to each of the five cases are set forth in the margin.[4]

3. The same constitutional questions were also raised in a third suit in the Western District of New York, Annie Bell Crimes v. George K. Wyman, et al., 69 Civ. 262, commenced prior to the actions before us, in which a three-judge court composed of Circuit Judge Waterman and District Judges Henderson and Burke was constituted and heard a consolidated argument for all three cases presented in Albany on September 3, 1969.

4. Plaintiff Luretha Gaddis came with her six children in August 1968 from Jackson, Miss. to Mamaroneck, N. Y. to care for her ill aunt. Failing to earn enough to feed, clothe and house her family, she applied to the Westchester County Dept. of Social Services for AFDC assistance which was denied on May 27, 1969, pursuant to § 139-a. On July 3, 1969 she commenced the present suit, and on July 9, 1969 her application for aid was approved, since which time she has received assistance.

Plaintiff Willa Jean Manning came with her two children on July 9, 1969, from Toledo, Ohio to Mount Vernon, N. Y. to escape further harm from an abusive husband. Having exhausted her meager funds on travel and necessities, she applied to the Westchester County Dept. of Social Services for AFDC assistance, which was denied under § 139-a. Emergency aid was thereafter provided pursuant to § 350-j.

Plaintiff Annie Bell McAllister came with her husband and three children in late August 1968 from Florence, S. C. to Peekskill, N. Y., where her husband, who was employed for a few months, deserted her. After working as a domestic for several months she applied on January 31, 1969 to the Dept. of Social Services for aid and was granted assistance. In July 1969, after she gave birth to another child, her assistance was discontinued under § 139-a, pending eligibility. On July 10, 1969 emergency § 350-j assistance was furnished.

Plaintiff Ruth Mickle, who is expecting her first child in September, came on June 14, 1969 from South Carolina to Mount Vernon, N. Y. to live with her mother and sister. Because of the impending birth she could not seek employment (as she had done in previous summers) and finding herself destitute and in dire need, sought AFDC assistance, which was denied under § 139-a.

Plaintiff Ossie Bowens came with her 3 children on May 15, 1969 from Georgia to live with her brother, his wife and two children in a two-bedroom apartment in Syracuse, N. Y., after Mrs. Bowens had been severely injured in Georgia. She is indigent. When her relatives were unable to provide the necessary assistance, on May 26, 1969 she applied to the Social Services officers in Syracuse for AFDC assistance, which was denied under § 139-a.

By stipulation some of the plaintiffs have received temporary emergency assistance pursuant to § 350–j, N.Y. Social Services Law, which authorizes emergency assistance to needy families for a period up to 30 days regardless of their qualifications for permanent assistance. When it appeared upon argument that such emergency assistance had expired or was about to expire and that serious and irreparable harm would be suffered by some of the named plaintiffs unless immediate assistance was forthcoming, we issued a temporary restraining order enjoining defendants, pending determination of the issues before us, from denying assistance to such plaintiffs because of failure to comply with the requirements of § 139–a.

At the outset we reaffirm that upon the facts before us the prerequisites established by Rule 23, F.R.C.P., for conduct of the actions as class suits are present. It is not disputed that numerous indigent persons have applied for and continue to apply for home relief or aid to dependent children within one year after establishing residence in New York, which brings § 139–a into play. Questions of law and defenses common to this class are presented, and the representation of the parties by the Legal Aid Society of Westchester County and the Onondaga Neighborhood Legal Services, Inc., coupled with *amicus curiae* interest on the part of the Columbia Center on Social Welfare Policy and Law, assures adequate protection of the class.

■ It is equally apparent that neither action has been mooted by intervening grants of assistance to certain applicants and the fulfillment of one-year's residence in New York on the part of others. There remain plaintiffs (Manning, Mickle and Bowens) against whom § 139–a will continue to be invoked for a substantial period of time unless relief is granted, and a dispute exists as to denial of aid to Mrs. Gaddis for May and June, 1969. Upon argument counsel for plaintiffs in the *Gaddis* suit further informed the Court of the existence of other applicants denied aid on the basis

of § 139–a who are presumably ready to step into the shoes of any named plaintiff forced to withdraw. Dismissal for mootness would therefore not be warranted. Kelly v. Wyman, 294 F.Supp. 887, 890 (S.D.N.Y.1968) (per Bryan, J.), and 294 F.Supp. 893, 908 (S.D.N.Y.1968) (per Feinberg, C. J., three-judge court).

■ Turning to the merits, a dispute exists between the parties as to the manner in which § 139–a has been applied. Defendants contend that the statute is invoked to bar assistance only to those whose *sole* purpose in entering the state is to obtain public assistance, whereas plaintiffs assert that in actual practice it is used as the basis for refusing aid to a resident of less than a year even though the applicant had other purposes in mind upon entry, such as obtaining employment in the cases of plaintiffs Gaddis, McAllister and Mickle. We find it unnecessary to resolve the issue, however, for the reason that even if § 139–a is construed as urged by defendants, the Supreme Court's recent decision in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (April 21, 1969), dictates that it be declared unconstitutional on its face. In that case the Court held that state statutes denying public assistance to applicants who had not resided in such states for at least one year, violated the Equal Protection Clause by drawing an invidious distinction between those who resided in the state for more than a year and those who had not, which infringed upon the latter's constitutional right to travel and could not be justified either under the traditional standard of bearing a reasonable relationship to a legislative purpose, see McGowan v. Maryland, 366 U.S. 420, 425–427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), or the stricter standard of promoting a "compelling state interest," see Harper v. Virginia Board of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Prior to *Shapiro* the Court had nullified similar state laws as violative of the Commerce Clause, Art. I, § 8, and

(in a concurring opinion by Justice Jackson) the Fourteenth Amendment's Privileges and Immunities Clause. Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (California statute prohibiting the bringing of a non-resident "indigent person" into the state).

Like the durational residence statutes struck down in *Shapiro*, § 139–a classifies those seeking home relief or AFDC assistance into 2 categories, those who have resided in New York for more than a year and those who have not.[5] The former are entitled to aid upon meeting established eligibility requirements whereas the latter, in addition to meeting such requirements, are presumed to have entered New York for the purpose of seeking assistance and must sustain the burden of proving a negative (that they did *not* enter for the purpose of securing assistance) by "clear and convincing proof." It is questionable whether the statutory presumption as to motive is factually supportable or bears any rational relationship to established facts. Furthermore, the burden of persuasion imposed upon the applicant is heavier than that required of most civil plaintiffs (fair preponderance of the evidence) and is one usually reserved for exceptional controversies (fraud, undue influence), more nearly approximating the standard imposed upon the Government in a criminal case (proof beyond a reasonable doubt). See McCormick on Evidence 676, 679–681 (1954 ed.). The effect could be to work a grave injustice by rendering an arbitrary presumption almost conclusive. These features, standing alone, raise an issue as to the validity of § 139–a. Cf. Morrison v. California, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Slochower v. Board of

Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). However, since we believe the case to be governed by *Shapiro*, it becomes unnecessary to determine whether the statute is constitutionally vulnerable upon other grounds.

That deterrence of in-migration was the purpose behind § 139–a is disclosed by its legislative history. Although New York's Governor in 1960 vetoed an orthodox durational residency law of the type later declared unconstitutional in *Shapiro* on the ground that it was repugnant to state policy, see 1960 New York State Legislative Annual, pp. 672–73, § 139–a (popularly named the Mahoney or "Welfare Abuse" Law) was passed in 1961 as a compromise. As enacted in 1961 the law authorized New York's public welfare officials, where they had reason to believe that an applicant had come into the state for public assistance, to conduct an investigation to determine eligibility through use of various criteria, including employability and, in a case where the applicant had entered New York within six months, to determine whether the applicant had "entered the state for some purpose other than to receive public assistance and care." With the increase in New York's welfare expenditures over the next few years, coupled with serious fiscal crises and the frequently-expressed view that New York was becoming a "welfare haven", for "relief shoppers," see Residence Requirements for Public Relief, Colum. J. of Law & Social Problems, Vol. 2, p. 133 (1966), efforts to get a residency bill passed were renewed, coupled with pressure to limit the size of the state's welfare budget, see Governor's Budget Message, 1969–70, p. M22. The movement to quell the "spiraling rise of

---

5. Since § 139–a is limited to applicants for "home relief or aid to dependent children" it draws a further distinction between such applicants and those seeking other types of categorical relief available under cooperative federal-state programs administered by the State of New York, such as aid to the Aged, Blind and Disabled, 42 U.S.C. §§ 402, 1201, 1381, and for Maternity and Child Welfare, 42 U.S.C. §§ 701, et seq. Applicants for the latter types of assistance would not be required within one year after arrival to comply with the conditions imposed on applicants for home relief and AFDC.

public assistance rolls and the expenditures therefor," Ch. 184, Laws of New York 1969, culminated in the New York Legislature's adoption on March 30, 1969 of the present stricter amended version of § 139–a, which denies home relief or AFDC assistance to the indigent in-migrant unless she can establish by clear and convincing proof that she did not enter the state for the purpose of securing such assistance. Ch. 184, § 8, Laws of New York, 1969.

Thus both the language and the legislative history of § 139–a make it abundantly clear that its objective is to deter indigents from migrating into New York for the purpose of taking advantage of higher home relief or AFDC assistance payments available here. That objective, regardless of the statutory form by which it is implemented (whether in terms of duration of residency, burden of proof as to motive, or the like) has been foreclosed by *Shapiro* as violative of the Equal Protection Clause.

> "But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible. * * * Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible." Shapiro v. Thompson, 394 U.S. 618, 629, 631, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (1969).

From a constitutional standpoint § 139–a is legally indistinguishable from the statutes thus invalidated and, indeed, is similar to one of them, Conn.Gen.Stat. Rev. § 17–2d (1965 Supp.), now § 17–2c, which, in denying assistance to those residing in Connecticut less than a year, made an exception "for those persons who come to Connecticut with a bona fide job offer or are self-supporting upon arrival in the State and for three months thereafter."

In striking down state statutes that automatically render applicants for assistance ineligible for aid during the first year of residency, regardless of their motive in establishing residence,

the Supreme Court did not imply that an exception might be made permitting determent of those whose *sole* purpose in entering the state was to obtain higher benefits. On the contrary, although the Court noted that durational residency statutes "enact what in effect are nonrebuttable presumptions that every applicant for assistance in his first year of residence came to the jurisdiction solely to obtain higher benefits," it went on to state:

> "More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among other factors, the level of a State's public assistance. Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better educational facilities." (*Ibid.*, pp. 631–632, 89 S.Ct. p. 1330)

Thus the Supreme Court has unequivocally barred a state from discouraging entry of indigents, regardless of their motive in migrating.

No legally recognizable state interest has been offered as justifying denial of public assistance to an applicant on the ground that she entered the state solely for the purpose of obtaining it. The argument that such a standard furthers the state's policy of encouraging self-support and self-employment must be rejected. No rational relationship exists between an applicant's motive in entering the state and her ability to obtain employment or support herself and her children. Her employability and means for self-support should be ascertainable by the same methods and standards used

724

to determine the eligibility of long-time residents.[6] Fraud in obtaining public assistance is punishable without regard to the applicant's motive in entering the state. N.Y. Social Services Law § 145. A classification basing eligibility upon motive, therefore, draws an invidious and irrational distinction between those who have resided in the state for more than a year and those who have not, all with a view to discouraging the latter's exercise of their constitutional right of travel.

We appreciate and sympathize with the desire of the government of New York to preserve the state's fiscal integrity and its welfare programs. It has been faced with a substantial increase in the number of recipients of public assistance in recent years. Podell, "A.F.D.C. in New York City and Other Major Urban Areas," Center for the Study of Urban Problems, City University of New York, March 1969, pp. 3–5. Aid to dependent children represents the largest segment of the state's welfare budget. Report of the Joint Legislative Committee to Revise the Social Welfare Law of New York State, 1967–68 p. 37. New York's welfare payments exceed the average for the country, N.Y. Times, April 8, 1969, p. 38, and recipients of public assistance do not expand the tax base which is the source of most of the state's welfare budget. But all of these budgetary factors, troublesome and important as they are for the people of New York, cannot validate a state's attempt to inhibit the American citizen's long-established constitutional right to travel from state to state and reside

where he pleases. As long ago as 1849 Chief Justice Taney stated:

"[the Constitution] intended to secure the freest intercourse between the citizens of the different States. For all the great purposes for which the federal government was formed, we are one people, with one common country. We are all citizens of the United States; and as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own states." Passenger Cases, 48 U.S. (7 (How.) 283 (1849).

The failure of state attempts to fence out migrant indigents intent upon exercising their constitutional right of travel has led some to conclude that the welfare budget problem "has become the common responsibility and concern of the whole nation," Edwards v. California, *supra*, 314 U.S. p. 175, 62 S.Ct. p. 168, the solution of which depends upon adoption of national welfare laws of the type recently recommended by the President, which would assure the needy, wherever located, of minimum assistance. See N.Y. Times, Aug. 9, 1969, p. 10. In any event the solution must be found elsewhere than in the type of statute here under review.

In view of our conclusion that § 139–a is unconstitutional upon its face, it becomes unnecessary for us to decide whether it violates the Social Security Act and regulations promulgated thereunder.

■ In contrast to § 139–a, nothing about § 121, or the manner in which it has been applied, furnishes any ground for questioning its validity, either under

6. New York has already established, pursuant to Social Services Law § 350-f, et seq., a work incentive program which applies to all applicants for AFDC assistance, regardless of the length of their residency. Those possessing qualifications are referred to such appropriate jobs as are available, or to job training or special work projects, whereas those who refuse without good cause are either denied aid or referred to counselling or other services pursuant to § 350-g.

Employable persons receiving home relief are required by Social Services Law § 164 to perform such work as is assigned to them by Social Services officials furnishing home relief. Defendants fail to offer any reason why these programs, which are used with respect to recipients residing in New York for more than a year, are not equally effective to implement the state's policy of promoting self-employment on the part of new entrants.

the Constitution, the Social Security Act, or the regulations issued by the Department of Health, Education and Welfare. Only the Gaddis complaint challenges the validity of § 121 (the *Bowens* complaint limiting itself to an attack on § 139–a) and it is significant that the only ground urged by the *Gaddis* plaintiffs is that § 121 is used to aid the enforcement of § 139–a by authorizing the Department of Social Services to offer to indigents declared ineligible under § 139–a free transportation back to the state whence they came. Section 121, however, does no*t compel* an applicant to leave New York or return to her former state of residence, as is illustrated by the case of Mrs. Willa Jean Manning who continues to reside in New York even though she had been offered money for transportation back to Ohio. Section 121, therefore, represents nothing more than a means of assisting an indigent person who wishes voluntarily to proceed to another state where legally responsible friends or relatives are willing to furnish support. Defendants' motion to dismiss the complaint insofar as it is based upon the alleged invalidity of § 121 must be granted.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.C.P.

Settle order on notice in accordance with Rule 65(d), F.R.C.P.