Rose HURLEY, Individually and on behalf of her minor children, Doreen Hurley, et al., Plaintiffs,

v.

Barry VAN LARE, Individually and in his capacity as Acting Commissioner of the Department of Social Services of the State of New York, et al., Defendants.

Annie TAYLOR, Individually and on Behalf of her minor, dependent child, Margaret Taylor, Charlotte Otey, Individually and on Behalf of her minor, dependent child, Kevin Otey, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Abe LAVINE, Individually, and in his capacity as Commissioner of the New York State Department of Social Services, and James M. Shuart, Individually, and in his capacity as Commissioner of the Nassau County Department of Social Services, Defendants.

Nos. 72 Civ. 3423, 73 Civ. 699.

United States District Court, S. and E. D. New York. Aug. 5, 1974.

The Legal Aid Society of Westchester County, White Plains, N. Y., for plaintiffs Hurley; Martin A. Schwartz, Lawrence S. Kahn, White Plains, N. Y., of counsel.

Nassau County Law Services Committee, Inc., Hempstead, N. Y., for plaintiffs Taylor and Otey; Leonard S. Clark, Hempstead, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Constance B. Margolin, Judith Gordon, Asst. Attys. Gen., of counsel.

Before HAYS, Circuit Judge, and BAUMAN, and WEINSTEIN, District Judges.

WEINSTEIN, District Judge.

Plaintiffs complain on behalf of a class of some 10,000 that the New York State regulations automatically reducing aid to families with dependent children (AFDC) (42 U.S.C. §§ 601–644) if the recipient houses a noncontributing "lodger" are unlawful both on constitutional and statutory grounds. Separate civil rights actions were brought in the Southern and Eastern Districts of New York. 42 U.S.C. § 1983; 28 U.S.C. § 1343(3); Fed.R.Civ.P. 23.

In each action the District Court sustained plaintiffs' statutory claim without considering the constitutional issues. Hurley v. Van Lare, 365 F.Supp. 186 (S.D.N.Y.1973); Taylor v. Lavine (unreported), Slip Op. 73–C–699 (E.D. N.Y.1973). The Court of Appeals reversed and remanded the cases "for the convening of a three-judge court to consider the constitutional issues. . . .

Taylor v. Lavine, 497 F.2d 1208, 1211, (2d Cir. 1974).

The actions have been consolidated for consideration of the constitutional issues by a three-judge court. 28 U.S.C. §§ 2281, 2284. *Cf.* Gaddis v. Wyman, 304 F.Supp. 717, 720 (S.D.N.Y.1969), aff'd per curiam sub nom. Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970). It is urged that the New York State "lodger" regulations (1) create an irrebuttable presumption offensive to due process; (2) invade rights to privacy and free association; and (3) deny equal protection of the laws. For the reasons set forth below, we conclude that the regulations in question are unconstitutional.

The AFDC program was designed by Congress "to help maintain and strengthen life," and to encourage recipients to "retain . . . personal independence consistent with . . . care and protection" of dependent children. 42 U.S.C. § 601. As enforced, the state regulations are corrosive of these goals. The nation's generous spirit of concern for the poor, with its concomitant desire to equalize the developmental opportunity of a young generation of impoverished, has been thwarted. Unless checked there is a clear tendency in such regulations as are before us to strip welfare recipients of the last vestiges of their sense of personal worth, to force them, in words used to describe a group existing on the edge of extinction, to "live on as a people without life, without passion, beyond humanity." C. M. Turnbull, The Mountain People 295 (Simon & Shuster Touchstone ed. 1972).

## I. FACTS

### A. CHALLENGED REGULATIONS.

The federal AFDC program provides states with matching funds to assist the "needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent . . . ." 42 U.S.C. § 606 (a). Among the New York regulations

under which AFDC funds are distributed are the two challenged here—18 N.Y.C.R.R. § 352.30(d), which reduces a recipient's shelter allowance if the recipient houses a noncontributing "lodger," and 18 N.Y.C.R.R. § 352.31(a)(3)(iv), which treats a man living with a female recipient but not married to her as a "lodger." These regulations read:

"*A non-legally responsible* [for support of the aided persons] relative or unrelated *person* in the household who is not applying for nor receiving public assistance shall not be included in the budget and *shall be deemed to be a lodger* or boarding lodger. . . . *In the event a lodger does not contribute at least $15 per month, the family's shelter allowance* including fuel for heating, *shall be a pro rata share of the regular shelter allowance.*" 18 N.Y.C.R.R. § 352.30(d). [Emphasis added.]

\* \* \* \* \* \*

"When a female applicant or recipient is living with a man to whom she is not married . . . his available income and resources shall be applied in accordance with the following:

\* \* \* \* \* \*

"(iv) When the man is unwilling to assume responsibility for the woman or her children, and there are no children of which he is the acknowledged or adjudicated father, he shall be treated as a lodger in accordance with section 352.30(d)." 18 N.Y.C.R.R. § 352.31(a)(3).

Ostensibly New York enacted 18 N.Y.C.R.R. 352.30(d) pursuant to its duty under the federal AFDC program to determine a recipient's actual need by taking "into consideration any other income and resources of any child or relative claiming aid to families with dependent children." 42 U.S.C. § 602(a)(7). Aimed as it is at preventing state welfare funds from going where they are not needed, the regulation makes two alternative irrebuttable presumptions. First, it presumes that a recipient family able to have a noncontributing lodger needs less housing space for its own use and consequently needs less money to pay for less space. The second alternative presumption is that a recipient family able to house a noncontributing lodger—even if the family could not reasonably subsist in less space—somehow needs less money to pay its share of the rent. Apparently the rationale of this presumption is that the lodger could, should, and therefore would, pay his or her proper share of the rent if forced to by a reduction in the recipient family's shelter allowance, for it assumes—irrebuttably—that, at least if he is a male, a "lodger" has "available income and resources." 18 N.Y.C.R.R. § 352.31(a)(3)(iv).

Under the regulations no hearing to determine if, or how, a reduction will adversely affect particular dependent minor children can be had. There can be no hearing to decide whether in any particular case the presumptions are contrary to the facts. Whether the "lodger" be a sister, a child, or adult companion who helps hold the family unit together, whether this "lodger" can or will contribute towards the rent, and whether the "lodger's" presence saves the state money are all undisputable under the regulations.

## B. THOSE AFFECTED BY THE REGULATIONS

The backgrounds of the named plaintiffs have been sufficiently set forth in prior published opinions. *See* 497 F.2d 1208 (2d Cir. 1974); 365 F.Supp. 186 (S.D.N.Y.1973). Local welfare agencies have reduced or are threatening to reduce the shelter allowances of AFDC recipients on the basis of these regulations: Mrs. Hurley and her three children from $150 to $115 because she lived with a man not her husband; Mrs. Taylor and her two children from $165 to $110 because she allowed her incapacitated sister to stay with her; and Mrs. Oley and her minor son from $145 to $96.65 because she allowed an adult unemployed son to sleep in the apartment.

Typical of the factual situations which welfare officials must ignore in applying the mechanical regulation is that related by Mrs. D, who testified at the trial. She and her two minor children reside in Mount Vernon in an apartment characterized by Paul Davidoff, a distinguished urban planner, as "far below a modern standard for decent accommodations for a family of that size." They have received AFDC assistance for approximately the last six and one-half years. She has not seen or heard from her husband since July, 1965; when she attempted to obtain a divorce Legal Aid could not go forward with the case, she testified, because she could not afford necessary disbursements. Over the past six years Mrs. D_ has been hospitalized some dozen times for surgical and other treatment. Because of her illnesses and periods of convalescence, plaintiff has not been able to carry out many family and household functions; obviously she is not well and seems aged beyond her years.

A male friend of the family has taken up residence in the D household. During Mrs. D's periods of illness and convalescence, he took care of her and her children, shopped for food, washed the family's clothes, cooked the family's meals, cleaned the house and performed other household tasks. He, himself, has various disabilities including extreme high blood pressure and he is presently unable to work. He is under no legal obligation to support the family and, in fact, has provided no financial support. Because of his presence local welfare officials informed Mrs. D:

"Quality control reports of 1/15/72 indicated that Mr. [M.] resides with you and your family. Therefore, we are prorating your rent ¾ of $175=$131.40."

The proposed reduction in Mrs. D's public assistance grant would leave the mother and two children with insufficient funds to purchase those necessities of life—food and clothing—requisite for a minimum standard of living.

Whether the state would save money were the male to leave—or himself successfully apply for a welfare grant, as he probably could—is not clear. In view of the mother's health, one of her social workers informed her that she would be entitled to homemaker and other assistance. The effect on the children, who now refer to the man as "daddy," of his leaving certainly cannot be assumed to be beneficial.

Mrs. D's case is illustrative of other situations where a mother on welfare houses a noncontributing adult male companion. The poor do not necessarily cohabit on a bed of roses. In the D's case the two sickly adults and two young children abandoned by their father live in substandard accommodations and use broken furniture—purchased from a company to which Mrs. D had been steered by a welfare worker; and the children and mother receive a bare subsistence allotment for food and other necessities.

D's case was put in perspective as typical by Professor Herbert Gans of Columbia University, whose work in the sociology of the poor is well known and highly regarded. He described the reason for the prevalence of such arrangements among the poor as follows:

"Poor people often live a very insecure existence, not only in terms of the amount of money they have, but the uncertainties about how long they will have it. . . .

"So, quite frequently you do get a pattern among poor people, if they can't work or they can't find work either temporarily or permanently, of moving in with a relative, either temporarily or permanently, because there simply isn't any money to establish or to continue to maintain one's own household. And typically, then, the people then become lodgers, help out in the family in various ways in lieu of paying rent, helping to raise the children, taking care of the house, doing a variety of things. I think that's one major explanation.

\* \* \* \* \* \*

"There are poor people who either feel that their poverty is temporary and don't want to go on welfare, don't want to get involved with being on welfare—welfare itself is a full-time job quite often—you know, filling out of the forms, dealing with the regulations, dealing with the social workers and the case workers, and what have you, and so they simply say we are not going to go on welfare and hope perhaps their problem is temporary. Other people . . . just . . . have the pride of independence, as it is sometimes called, and say they want to make it on their own however that is going to be."

This "doubling up phenomenon among poor people . . . is particularly [prevalent] . . . where the head of the household is a woman." He went on to add:

"[W]here there is poverty and insecurity people get very dependent on each other to tide them over during crises, so that you have, and this has been found in studies all over the world among poor people . . . [,] a very generous extension of help and hospitality to others, relatives and close friends.

"And this exists not because poor people are necessarily more altruistic or more generous than other people, but because this is really the only way you can survive in a crisis. If you don't have somebody who you can rely on to bail you out with a couple of dollars to get you to the hospital, if one of your kids suddenly gets sick, to provide you a room if your landlord evicts you or if your building burns down or becomes uninhabitable, if this ability to call on somebody for help is not available, then survival for the poor is much more risky. And so what happens is you get a pattern of mutual help, of mutual obligation, people helping each other because they know if they help somebody when they have a problem, they will be helped in return.

"One part of this helping phenomenon is people making room in their house for somebody who is in need of shelter temporarily or permanently, and again only in this case on the grounds that if I don't do it for him or her now, he won't do it for me when I am faced with that problem."

As Dr. Gans pointed out, "This is a very important phenomenon that middle class people don't do much of and don't understand."

It is this need for mutual help that explains, Dr. Gans noted, why housing, which is already inadequate, is shared with others:

"[E]specially [in] the New York area, they get small apartments with small rooms, if they are [on] Welfare . . . so they live in a minimum space to begin with.

"When somebody else comes in they become more crowded, obviously. But the exchange—they make this sacrifice because again this is a perfect example of obligation of mutual help that I discussed earlier. You make a sacrifice because then you obligate the other person to help you when you are in need."

The effect of enforcing regulations such as we have before us is to force the man out of the house. As Dr. Gans testified:

"[D]ivorce has always been very difficult for the poor to get because (a) it costs money to get divorced, (b) it costs money to get a lawyer, until recently it was impossible for poor people to get free legal help, so that there has been a long tradition of simply physical separation but no divorce."

\* \* \* \* \* \*

"I am talking generally [about] what happens in the poor community.

"Quite often the relationship between men and women is a very fragile one, particularly when the men are . . . economically marginal in society and told that they are not useful

economically, (a) the men don't have much money, (b) their egos are very sensitive and they might just say well, if you ask me to pay I will just move out on you and that would be the end of—in essence, the relationship would be sacrificed to whatever the rental money was.

"[I]f the lodger is a man who is living with a woman, he becomes a lodger to serve a variety of functions in the family, helping raise the children, taking care of the house. I think the relationships are such that if the woman asked him for money, in most cases he doesn't have it, even if he had it he might say well, if you put it on that basis, I will just move out and then the woman is deprived of the relationship with the man which is part of life and of the fatherly functions that this kind of lodger often performs."

## II. THE LAW

### A. THE DUE PROCESS CLAIM

■ As the Supreme Court again noted this Term in Cleveland Board of Education v. LaFleur, 414 U.S. 632, 644, 94 S.Ct. 791, 798, 39 L.Ed.2d 52, 62 (1974), declaring invalid a presumption that pregnant women were incapacitated from teaching, " 'permanent irrebuttable presumptions have long been disfavored under the Due Process Clause of the Fifth and Fourteenth Amendments.' " There is no warrant for automatic denial of a right on the basis of an irrebuttable presumption, "when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination." Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63, 71 (1973) (irrebuttable presumption of nonresidency of student invalidated). See also, e. g., United States Dep't of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (denying food stamp eligibility on basis of irrebuttable presumptions of lack of need unconstitutional);

Stanley v. Illinois, 405 U.S. 645,. 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (irrebuttable presumption preventing unwed father's custody of child violative of due process); Stewart v. Wohlgemuth, 355 F.Supp. 1212 (W.D.Pa.1972) (irrebuttable presumption terminating welfare benefits of college students violative of due process); Owens v. Parham, 350 F. Supp. 598 (N.D.Ga.1972) (irrebuttable presumption reducing shelter allowance on ground members of household bear pro rata share of expenses violative of due process); Boucher v. Minter, 349 F.Supp. 1240 (D.Mass.1972) (irrebuttable presumption terminating shelter allowance where stepfather lives in same house violative of due process).

### 1. THE PRESUMPTIONS RELIED UPON BY THE STATE

#### A. *Less space needed if "lodger" present.*

■ The presumption that a recipient family able to house a noncontributing lodger needs less space for its own use "is not necessarily or universally true in fact." The lodger may be an older child sharing a single or bunk bed with a younger sibling, or a disabled relative sleeping on the couch. If the lodger is the mother's adult male companion, he may be sharing the mother's own bed. None of these plausible factual circumstances fairly imply that the family could realistically subsist in less space.

Moreover, even if we were to assume that a family able to house a noncontributing lodger needs less space for its own use, under present conditions many families could not locate habitable smaller quarters. Plaintiffs' housing expert, Mr. Paul Davidoff, gave uncontradicted testimony that in the New York City metropolitan area, the poor live in housing that is predominantly substandard and inadequate in terms of space, and that, therefore, it is highly unlikely that a family on welfare could find and move into a liveable smaller apartment.

The almost zero vacancy rate for low-rental housing in large parts of New

York State supports Mr. Davidoff's conclusion. *See, e. g.,* Talbot v. Romney, 321 F.Supp. 458, 470 (S.D.N.Y.1970) (vacancy rate drop from 3.2% in 1965 to 1.2% in 1968); Parkwood Realty Co. v. Marcano, 77 Misc.2d 690, 353 N.Y.S. 2d 623, 625 (N.Y.C.Civ.Ct.1974); 1970 Census of Housing, Detailed Housing Characteristics: New York 34–167, 34–171; State of New York, Executive Department, Division of Housing and Community Renewal, Survey Report on Rental Housing 3 (1969); J. C. Lynn, Recent Housing Trends in Westchester County 7, 8 (Westchester Planning Occasional Papers, Winter 1974); Report on Housing and Rents of the Temporary State Commission on Living Costs and the Economy 72–73 (1974); Economic Consultants Organization, Inc., Residential Analysis for Westchester County, Growth of Demand and Supply: 1970–1990, Interim Report No. 3, 50 (1970), Interim Report No. 5, 47 (1970). Low cost housing available to welfare recipients is further constricted by negative community attitudes toward minority groups and subsidized housing (Interim Report No. 5, *supra,* at p. 47; Interim Report No. 3, *supra,* at pp. 3–4) and the lack of institutional financing available for buildings currently housing recipients. City of New York, The Urban Housing Dilemma: The Dynamics of New York City's Rent Controlled Housing 551–53 (Prel. undated). Negative attitudes of landlords and apartment owners toward public assistance recipients also limits availability. City of New York, The Urban Housing Dilemma, *supra,* at pp. 555–56, 564–66.

The welfare recipient is put at more of a disadvantage in the ever shrinking housing market since she or he lacks "contacts" and entries into the market system. Fewer than 10% of recipients obtain housing through the Department of Social Services in Westchester County. Interim Report No. 7 (1970), *supra,* at pp. xii, 101. "Urban renewal and construction of public housing have had little impact on the number of units available to low income households. In most instances, new units built merely replace existing units removed from the stock." Interim Report No. 3, *supra,* at p. 3. The long waiting lists for public housing are well known.

It is apparent, therefore, that even if a family housing a noncontributing lodger could subsist without the lodger in a smaller apartment, the family probably could not locate decent smaller quarters. In that event, the family's rental expenses would remain as high as they were before the lodger came; there would be no diminuation of financial need.

If not for the challenged regulations and the irrebuttable presumptions they make, we would have thought it beyond debate that a family on public assistance might choose to house a noncontributing lodger for many reasons other than the presumed excess of living space. For example, a recipient might agree out of familial kindness and generosity to shelter a family member or relative who might otherwise suffer. Or a lonely mother raising her fatherless children might house a friend out of a deep, human need for supportive, adult companionship. A welfare regulation encouraging a woman in Mrs. D's circumstances to remove her "lodger" exacerbates the familial disintegration already experienced by the urban poor.

In short, the presumption that a recipient family able to house a noncontributing lodger needs less space for its own use is neither necessarily nor universally true in fact. The evidence before us shows it has no basis in fact for many AFDC families.

### B. *Less financial need where "lodger" present.*

Similarly, the second, alternative, presumption that a recipient family able to house a noncontributing "lodger"—even if the family does not *ipso facto* need less space for its own use—needs less money to pay its own, *pro rata,* share of the rent is neither necessarily nor universally true. Unless the lodger pays a "share" of the rent, the family's rental

expenses are not affected by the "lodger's" presence.

But the state may not conclusively presume that a lodger will pay his share of the rent, under the compulsion of a reduced shelter grant, merely because ethically he should or theoretically he could. *See* R. M. O'Neil, The Price of Dependency 253–254 (1970) (reasons why many people eligible for relief do not seek it); F. F. Piven & R. A. Cloward, Regulating the Poor 165 (Vintage ed. 1972) ("degradation at the hands of relief officials . . . deters actual or potential workers from seeking aid."). "[F]ederal law prohibits a conclusive presumption of support." Taylor v. Lavine, 497 F.2d 1208, 1215 (2d Cir. 1974). We know from the evidence before us that some AFDC family "lodgers" do not pay anything towards rent.

Certainly "the State has reasonable alternative means of making the crucial determination" (Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63, 71 (1973)) as to space and contribution where a lodger is present or believed present. That alternative means is the "Fair Hearing," a proceeding provided by 18 N.Y.C.R.R. § 358.1–.27 to review the reduction of AFDC grants.

Making these individualized determinations may not completely serve the cause of "administrative efficiency," but as the Supreme Court stated in Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551, 561–62 (1972):

> "[T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." (Footnote omitted.)

*See also* Cleveland Board of Education v. LaFleur, 414 U.S. 632, 646, 94 S.Ct. 791, 799, 39 L.Ed.2d 52, 64 (1974).

Irrebuttable presumptions are offensive to due process because they effectively deny an individual the essential procedural right to challenge the purported factual basis of a determination adversely affecting his own liberty or property. In this case the "property" right in question is the AFDC recipient's statutory entitlement to a shelter allowance commensurate with actual need. Thus the rule against irrebuttable presumptions is an aspect of procedural, not substantive, due process. *See* Vlandis v. Kline, 412 U.S. 441, 455, 93 S.Ct. 2230, 2238, 37 L.Ed.2d 63, 73–74 (1973) (Marshall, J., concurring, joined by Brennan, J.); *see also* Note, The Supreme Court, 1972 Term, 87 Harv.L.Rev. 57, 70 n. 21 (1973); *cf.* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Before reducing the shelter allowance of a recipient family because the family houses a noncontributing lodger, the state must make an individualized determination of whether the presence of the lodger does *in fact* diminish the family's shelter needs. If presumptions are used they must be rebuttable. *See* Proposed Federal Rules of Evidence 301, promulgated by the Supreme Court but not yet effective. This constitutionally required result is consistent with the statutory mandate of the federal AFDC program. *See, e. g.,* Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Hausman v. Dep't of Institution & Agencies, 64 N.J. 203, 314 A.2d 362, cert. denied, 417 U.S. 955, 94 S.Ct. 3083, 41 L.Ed.2d 674 (1974); Rosen v. Hursh, 464 F.2d 731 (8th Cir. 1972); Mothers and Childrens Rights Org., Inc.

v. Stanton, 371 F.Supp. 298 (N.D.Ind. 1973); Gaither v. Sterrett, 346 F.Supp. 1095 (N.D.Ind.), aff'd, 409 U.S. 1070, 93 S.Ct. 688, 34 L.Ed.2d 660 (1972); X v. McCorkle, 333 F.Supp. 1109 (D.N.J. 1970); aff'd per curiam sub nom. Engelman v. Amos, 404 U.S. 23, 92 S.Ct. 181, 30 L.Ed.2d 143 (1971); Gilliard v. Craig, 331 F.Supp. 587 (W.D.N.C.1971), aff'd, 409 U.S. 807, 93 S.Ct. 39, 34 L. Ed.2d 66 (1972), reh. denied, 409 U.S. 1119, 93 S.Ct. 892, 34 L.Ed.2d 704 (1973); Jenkins v. Georges, 312 F.Supp. 289 (W.D.Pa.1969); Solman v. Shapiro, 300 F.Supp. 409 (D.Conn.), aff'd, 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969); Battle v. Lavine, 44 A.D.2d 307, 354 N.Y.S.2d 680 (2d Dep't 1974). *See also* 45 C.F.R. 233.20(a)(1); 233.-20(a)(3)(ii); and 233.90(a).

## III. OTHER CLAIMS

### A. ANOMALY IN REGULATION

■ Under state administrative interpretations section 352.30(d) requires a "lodger" to contribute only $15.00 per month to the recipient family's rent; it does not require the lodger to pay a "pro rata share" of the rental. To encourage the taking in of rent-paying lodgers the first $15.00 of lodger income is, under the regulation, ignored. As one of the state's witnesses admitted, the New York statutory lodger policy achieves this anomalous result: if a lodger pays $15.00 per month, the recipient family has nothing deducted from its shelter allowance; but if the lodger pays less than $15.00 or nothing at all, the family has a full, pro rata share of its shelter allowance—in some of the instances before us as much as $50.00—deducted.

The head of a household on welfare might, the witness conceded, avoid the impact of § 352.30(d) altogether by loaning a lodger $15.00 per month to enable him to make a $15.00 rental contribution and then later cancelling the loan if it was not repaid. Generally, however, welfare families are not skilled in the art of self-interested financial manipulation. The possibility, therefore, that all members of the class might evade the regulation does not make it illusory and has no effect on its invalidity.

### B. SEX DISCRIMINATION

■ It is not clear that New York's statutory lodger policy makes a distinction on the basis of sex. While § 352.-31(a)(3)(iv) is limited by its terms to a "male" lodger, this section is apparently superfluous. Section 352.30(d) speaks of a "non-legally responsible relative or unrelated *person*" (emphasis added); this section, standing alone, presumably would apply to a female living with but not married to a father-recipient no less than to a male living with but not married to a mother-recipient.

### C. FREE ASSOCIATION AND PRIVACY

■■ The State of New York is entitled—and as a participant in the federal AFDC program is under a duty—to determine actual need in granting welfare, including shelter assistance. Inquiring whether a lodger's presence in fact indicates a diminished need for shelter assistance is hardly a violation of plaintiffs' rights. The constitutionally protected rights of free association and privacy do not compel the states to misallocate their scarce welfare resources. The problem with the regulations under challenge here is not that they somehow invade rights of free association or privacy, but that they do not determine *actual* needs; rather they proceed on the basis of irrebuttable presumptions neither necessarily nor universally true in fact. Only if the challenged regulation sought to prescribe plaintiffs' familial or sexual life style, would the free association-privacy claim merit further consideration. *See* United States Dep't of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

### D. EQUAL PROTECTION

■ Plaintiffs also claim that the challenged regulations deny them equal protection of the laws. The challenged regulations distinguished between two

groups of welfare recipients: those who house a noncontributing lodger and those who do not. The purported objective of this distinction is a constitutionally appropriate one since, as we have pointed out, New York may seek to allocate its scarce welfare resources where they are most needed. The related issue of whether there is a factual basis making at least rational the legislative judgment that families housing noncontributing lodgers have a diminished need for shelter allowance, must be resolved by individualized determinations in accordance with the mandate of the due process clause. In the circumstances of this case, the equal protection claim overlaps analytically with the due process claim. It is, therefore, unnecessary to articulate a separate equal protection ground of decision.

## E. MOOTNESS

 Since the controversy affects many AFDC families and this is a class action, there is no need to decide whether a particular named plaintiff is still being adversely affected by the challenged regulations. Taylor v. Lavine, 497 F.2d 1208, 1213 n. 3 (2d Cir. 1974). Where there are numerous class members who suffer the same harm complained of by the named plaintiffs, or who are subject to like treatment in the future, the action does not become moot as to them and there remains a justiciable controversy. See, e. g., Richardson v. Ramirez, 418 U.S. 24, at 39–40, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); Johnson v. New York State Education Dep't, 409 U.S. 75, 76, 93 S.Ct. 259, 260–261, 34 L.Ed.2d 290, 292–93 (1972) (Marshall, J., concurring); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Steinberg v. Fusari, 364 F.Supp. 922, 928 (D.Conn.1973), appeal pending, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (1974).

## IV. CONCLUSION

Section 18 N.Y.C.R.R. § 352.30(d) and § 352.31(a)(3)(iv) are invalid to the extent stated in this opinion. The parties shall settle an order on forty-eight hours notice.

*So ordered.*

HAYS, Circuit Judge (dissenting):
I dissent.

The challenged regulation, 18 N.Y.C.R.R. § 352.30(d), is not unconstitutional. It sets up no "irrebuttable presumption . . . not necessarily or universally true in fact." Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973).

In Taylor v. Lavine, 497 F.2d 1208, (2d Cir. 1974), the Second Circuit considered the validity of section 352.30(d) in light of section 406 of the Social Security Act, 42 U.S.C. § 606(a) (1970), and 45 C.F.R. § 233.90(a). In *Taylor* the court held that section 352.30(d) does not create an irrebuttable presumption of contribution offensive to section 406(a) or the federal regulation.[1] It reasoned that prorating shelter costs between AFDC-eligible and non-eligible members of a household insures that AFDC funds are disbursed only to individuals who have demonstrated their need for assistance. It found that the New York regulation is reasonably justified by considerations such as the severability of individual needs, the divisibility of space, and the economies of scale that result from combining small living units into larger groups:

"Prorating housing costs between the recipient and non-recipient simply reflects the separability of the need of the AFDC-eligible family members from the needs of persons who have not demonstrated their eligibility for public assistance. Indeed, if a section 352.30(d) lodger can separately dem-

---

1. The *Taylor* court remanded the case so that the constitutional issues might be considered by a three-judge district court. The present case is the result of that remand. The opinion of the present majority ignores the *Taylor* rationale and in effect holds that section 406(a) of the Social Security Act and 45 C.F.R. § 233.90(a) are unconstitutional as applied in the Second Circuit.

onstrate his eligibility for public aid, the AFDC shelter allowance is increased to include his share . . . ." Taylor v. Lavine, 497 F.2d 1208, 1215.

The *Taylor* holding controls the present case. A non-contributing lodger, like the majority's Mr. M., must by necessity either have the means to make a pro rata contribution to the recipient household, or he must lack such means. If the lodger is financially able to contribute to the cost of maintaining the household, New York surely does not offend due process by abating the shelter allowance of the AFDC recipient pro rata according to the lodger's share. If the lodger is not financially able to contribute his share, New York permits him to establish his separate eligibility for public assistance. We have been assured that New York does not require persons of demonstrated need to go without shelter. Should the lodger establish his eligibility, it is admitted by all parties that a household like the Mrs. D-Mr. M. household would receive a shelter allowance increased over the amount received by the D household alone.[2]

It is thus clear that the New York regulation "presumes" that a lodger has the will and means to contribute his or her fair share toward housing expenses unless the lodger demonstrates separate eligibility for public assistance. Any "presumption" of the lodger's means may be refuted at the lodger's initiative in the same forum in which the AFDC recipient was initially required to establish a need for aid. The "conclusive presumption" denounced by the majority is the same "presumption" that attaches to every member of our society: that he is able to pay his own way until and unless he demonstrates the contrary. If the lodger is eligible for public assistance but does not apply, his silence cannot be put at the state's door. If the

lodger is too proud to accept welfare—Mrs. D's testimony indicates that such was Mr. M's motive for not applying for aid—then he ought to be too proud to accept aid from the state indirectly through the eligible AFDC recipient. A noncontributing lodger like Mr. M. has and eats his public assistance cake without demonstrating his need.

The majority states that the aid recipient's "Fair Hearing" under 18 N.Y.C. R.R. §§ 358.1–358.27 is a "reasonable alternative means" for determining the amount a lodger is willing or able to pay toward the cost of housing. But this statement glosses over the obvious difficulty of determining the means or intent of a person who has not put his affairs before the Social Services Department by applying for public assistance. In none of the recent Supreme Court due process cases cited by the majority did the reasonable alternative means of fact-finding entail intrusion into the affairs of any person who did not apply for or seek a governmentally administered benefit or right.

Section 352.30(d) does not "exacerbate [ ] the familial disintegration already experienced by the urban poor." It does not necessarily upset the established patterns of cooperation between people of limited and uncertain means. So long as each member of a group cooperating as a household establishes his eligibility for public funds, cooperating will increase the shelter allowance due the whole. In any event, the procedure implicitly sanctioned by the majority, requiring the lodger to submit his affairs to the New York Social Services Department in the context of the AFDC recipient's "Fair Hearing," is surely no less conducive to "familial disintegration" than requiring the lodger to demonstrate his need on his own application.

While assailing the rationality of section 352.30(d), today's majority em-

---

2. Under locally administered regulations, shelter allowances increase in rough proportion to the number of eligible persons in the recipient household. Were Mr. M. to establish his eligibility for public assistance there would be an additional eligible person in the household, and the shelter allowance would accordingly be increased.

braces irrationality. It creates a unique class of persons who may receive the benefit of state aid without demonstrating any need for such aid. It prefers lodgers in AFDC recipient households over all other lodgers. It prefers lodgers in AFDC households over the eligible AFDC recipients themselves, since the latter must bear the burden of demonstrating their eligibility. In our complex society there are no simple means of identifying households in need of state assistance, or of allocating the limited stock of resources among individuals who have demonstrated a need for such assistance. Section 352.30(d) is a valid attempt by New York to make such an allocation and it ought to be upheld.