**Edward R. JAGNANDAN et al., Plaintiffs-Appellants,**

v.

**William L. GILES, President, Mississippi State University, et al., Defendants-Appellees.**

No. 74-3467.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1976.

Mark Shenfield, Jackson, Miss., for plaintiffs-appellants.

Ed Davis Noble, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.

Before BROWN, Chief Judge, and GOLDBERG and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Plaintiff Reverend W. L. Jagnandan, on behalf of himself and his two sons, brought a class action to challenge the constitutionality of a Mississippi statute which classified all alien students, even Mississippi resi-

dents, as nonresidents for tuition and fee purposes at state institutions of higher learning. A three-judge district court denied the class action request, declared the statute unconstitutional as being in contravention of the equal protection and due process clauses of the Fourteenth Amendment, and granted injunctive relief. The court refused, however, to award plaintiffs reimbursement for the $3,495.00 in tuition and fees they had paid in excess of the amounts required of resident students, holding that such relief is barred by the Eleventh Amendment, as interpreted by the Supreme Court in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *Jagnandan v. Giles*, 379 F.Supp. 1178 (N.D.Miss.1974). Plaintiffs appeal the denial of reimbursement for the excess tuition and fees paid pursuant to the unconstitutional statute. Plaintiffs do not appeal the denial of their class action request, nor do the defendants appeal from the grant of declaratory and injunctive relief as to the statute's unconstitutionality.

This appeal presents important questions involving (1) the scope of our jurisdiction to review decisions of three-judge district courts, and (2) the scope of the Eleventh Amendment's prohibition against reimbursement of overpayments collected under an unconstitutional statute. As to the first question, we conclude that we do have jurisdiction to hear the appeal. On the merits, we hold that the Eleventh Amendment bars suits in federal court to recover excess tuition paid pursuant to an unconstitutional statute, and affirm the three-judge district court.

The Jagnandans were citizens of the Republic of Guyana (formerly British Guiana in South America) lawfully admitted into this country as aliens with permanent resident classifications.[1] Since September 1969 they have lived in West Point, Mississippi, where Reverend Jagnandan is a minister of a local church. Reverend Jagnandan pays Mississippi income taxes and owns an automobile registered in Mississippi. All three plaintiffs hold Mississippi driver's licenses. Each testified without reservation or qualification that he had no present intention of leaving the state, his purpose being to reside indefinitely in Mississippi.

The two sons, Edward R. Jagnandan and Leonard Susil Jagnandan, enrolled as full time students at Mississippi State University in the fall of 1970. Reverend Jagnandan himself enrolled at the University in the spring of 1972 as a candidate for a master's degree. The three were required to pay nonresident tuition and fees pursuant to a Mississippi statute classifying all aliens as nonresidents for tuition and fee purposes at state institutions of higher learning.[2]

In September 1970, contemporaneous with his sons' matriculations at Mississippi State, Reverend Jagnandan sought to establish with University officials his family's eligibility as state residents for tuition and fee purposes. Plaintiffs fully exhausted their opportunity for administrative relief and, upon being notified that they were ineligible for resident tuition rates, instituted this federal action.

## JURISDICTION

Congress has provided that suits seeking injunctive relief against the enforcement of state statutes by state officers must be heard and determined in the first instance by a specifically constituted district court of three judges, at least one of whom must be a circuit judge. 28 U.S.C.A. § 2281. Appeals lie directly to the Supreme Court from orders of three-judge courts "granting or denying, . . . an inter-

---

1. At oral argument counsel for plaintiffs informed the Court that subsequent to the filing of this appeal the Jagnandans have been naturalized as United States citizens. It is interesting to note that the guest speaker at the naturalization ceremony was Dr. William L. Giles, President of Mississippi State University, one of the defendants in this case.

2. Miss.Code Ann. § 37–103–23 (1972), formerly designated as Miss.Code § 6800–11(11) (1942). At all pertinent times, the general fees and tuition charges were separately established for resident and nonresident students, a higher rate ($300 more per semester) being required of nonresidents.

locutory or permanent injunction . . ." 28 U.S.C.A. § 1253.[3] Courts of appeals have jurisdiction over all appeals excepting those where direct review may be had in the Supreme Court. 28 U.S.C.A. §§ 1291 and 1292(a)(1).

Although this statutory scheme is simple enough to describe, it has proved to be far from simple in its operation and has "given rise to bewildering problems in the area of appellate review." 9 J. Moore, *Federal Practice* ¶ 110.03[3], at 70 (2d ed. 1975). Professor Wright has observed that the appellate rules relating to three-judge courts "are so complex as to be virtually beyond belief." C. Wright, *Handbook of the Law of Federal Courts* § 50, at 193 (2d ed. 1970). The Supreme Court itself has recognized that "[t]hese procedural statutes are very awkwardly drafted, and in struggling to make workable sense of them, the Court has not infrequently been induced to retrace its steps." *Gonzalez v. Automatic Employees Credit Union*, 419 U.S. 90, 95, 95 S.Ct. 289, 293, 42 L.Ed.2d 249 (1974) (footnotes omitted). This Court also has commented on the problems which arise when working in this area, noting that "the jurisdiction of three-judge courts and appellate jurisdiction arising from their decisions is a treacherous and fluid area of our jurisprudence." *Wernick v. Mathews*, 524 F.2d 543, 545 (5th Cir. 1975).

Last term the Supreme Court attempted to clarify the law in this confused area. In two cases, *Gonzalez v. Automatic Employees Credit Union, supra*, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974), and *MTM, Inc. v. Baxley*, 420 U.S. 799, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975), the Court restricted the scope of Supreme Court appellate jurisdiction under 28 U.S.C.A. § 1253 to situations involving denial of injunctions.

In *Gonzalez*, the Court unanimously held that jurisdiction over an appeal from an order of a three-judge court dismissing a complaint for lack of standing was vested in the courts of appeals. Although the Court explored the question of whether an order of a three-judge court "denies" an injunction, for purposes of 28 U.S.C.A. § 1253, where there is no adverse resolution of the constitutional claims presented, it reserved determination of that issue and rested its decision on a different ground. The decision was based, at least partially, on the reasoning that a three-judge court is not required and should not be convened when the district court lacked jurisdiction of the complaint or when the claim is not justifiably in the federal court. 419 U.S. at 100, 95 S.Ct. 289 *citing Ex parte Poresky*, 290 U.S. 30, 31, 54 S.Ct. 3, 78 L.Ed. 152 (1933). The Court noted that if a single judge had in fact issued the order of dismissal for lack of standing, no direct appeal to the Supreme Court would have been allowed.[4] Thus, it was "mere convenience or happenstance" that a three-judge court had ruled on the standing issue, and to avoid a fortuitous direct appeal, the Court held

> that when a three-judge court denies a plaintiff injunctive relief on grounds which, if sound, would have justified dissolution of the court as to that plaintiff, or a refusal to request the convention of a three-judge court *ab initio*, review of the denial is available only in the court of appeals.

*Gonzalez v. Automatic Employees Credit Union, supra*, 419 U.S. at 101, 95 S.Ct. at 296.

Three months later, in *MTM, Inc. v. Baxley, supra*, 420 U.S. 799, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975), the Court again considered the reach of its jurisdiction under § 1253. Directly addressing the question it reserved in *Gonzalez*, the Court, with Justice White concurring only in the result and Justice Douglas dissenting, held that direct

---

**3.** 28 U.S.C.A. § 1253 provides:

Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceed-

ing required by any Act of Congress to be heard and determined by a district court of three judges.

**4.** *See Ex parte Metropolitan Water Co.*, 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575 (1911).

appeal lies from a three-judge court order denying injunctive relief only when the order is based on the merits of the constitutional attack against the statute. Therefore, since in *MTM, Inc.* the three-judge court had dismissed the suit under the comity doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and did not reach the merits of the case, the Court ruled that it lacked jurisdiction over the direct appeal.

Although in each case the Supreme Court's decision was meant to limit its review under § 1253, the practical effect of the two cases may differ in particular situations.

> Under *Gonzalez*, the question of Supreme Court appealability turns on the power possessed by a single district judge. If a three-judge court denies an injunction on a ground within the decisional province of a single judge, review of the three-judge denial must be in the court of appeals. By contrast, *MTM* focuses on whether the three-judge court's denial of an injunction was grounded in a decision on the constitutional merits.

The Supreme Court: 1974 Term, 89 Harv.L. Rev. 1, 187 (1975). These differing approaches raise the question of whether *MTM, Inc.* supplements *Gonzalez*, or subsumes it.

These two decisions undoubtedly will serve in most cases to make more certain the proper forum in which an appeal of an order of a three-judge court should be taken. In this particular case, however, we are unsure as to whether jurisdiction of the appeal lies in this Court or in the Supreme Court. Under the *Gonzalez* standard it would appear that we properly have jurisdiction of the case, since the appealed order denying reimbursement does not involve a question of injunctive relief and thus is not one which had to be made by a three-judge court. It can be argued, however, that the question of reimbursement was so integrally related to the question of constitutionali-

ty which confronted the three-judge court, that its appealability must be considered as from an issue "within the decisional province" of a three-judge court.

Applying the *MTM, Inc.* test presents similar difficulties. It is clear that the order denying reimbursement was not based on a resolution of the merits of the constitutional claim for which injunctive relief was sought. Again, however, a plausible argument can be made that in this case the reimbursement issue is so closely related to the question of the constitutionality of the statute that the appeal of the order denying reimbursement should be heard by the same forum that would hear an appeal involving the constitutionality of the statute.

Moreover, had the state officials appealed the three-judge court's grant of injunctive relief, we would confront even greater conceptual problems. Such a situation would present the hypothetical suggested by Justice Douglas in his dissent in *MTM, Inc.*, whereby under a strict reading of the new standards, a case could be fragmented or split into pieces for purposes of appeal. 420 U.S. at 807, 95 S.Ct. 1278. The order granting the injunction would be appealed directly to the Supreme Court, while the same order denying reimbursement for excess past tuition and fees paid pursuant to the unconstitutional statute would be appealed to this Court.

■ The absence of an appeal from the injunctive relief eliminates that hypothetical from surfacing here. Our reading of both *Gonzalez* and *MTM, Inc.* leads us to believe that in this case the proper forum for appeal is in this Court, regardless of where appellate jurisdiction may lie in a case where the grant or denial of injunctive relief has also been appealed. By holding that we have jurisdiction to hear the appeal, we are supporting "the historic congressional policy of minimizing the mandatory docket of . . . [the Supreme Court] in the interest of sound judicial administration." *MTM, Inc. v. Baxley, supra*, 420 U.S. at 804, 95 S.Ct. at 1281.[5] Further-

---

5. *Accord, Gonzalez v. Automatic Employees Credit Union*, 419 U.S. 90, 98, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974).

more, by hearing this appeal we are giving the Supreme Court our opinion on the proper determination of the merits of the case, views which would not be available to that Court if only a direct appeal were available. *See Gonzalez v. Automatic Employees Credit Union, supra,* 419 U.S. at 99, 95 S.Ct. 289.

In short, based upon the recent Supreme Court decisions in *Gonzalez* and *MTM, Inc.,* and in the interest of sound judicial administration, we hold that jurisdiction over this appeal properly lies in this Court.[6]

## ELEVENTH AMENDMENT

The Mississippi statute requiring resident aliens residing in Mississippi to pay out-of-state tuition was ruled unconstitutional by the three-judge district court. *Jagnandan v. Giles,* 379 F.Supp. 1178 (N.D.Miss.1974). No appeal was taken from that holding. The court held, however, that the Eleventh Amendment bars plaintiffs' recovery of excess tuition payments made under the unconstitutional statute. In denying reimbursement the court relied on *Edelman v. Jordan,* supra, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and on *Edelman's* precursor, *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).[7] This denial of relief is challenged on appeal.

In presenting their case for reversal plaintiffs assert five arguments: (1) defendants are personally liable for the excess tuition payments; (2) the State of Mississippi is not a party to this suit for Eleventh Amendment purposes; (3) Mississippi waived its immunity; (4) *Edelman v. Jordan* does not preclude the type of relief here sought; and (5) the Eleventh Amend-

ment cannot be used to protect Fourteenth Amendment violations. Answering these points *seriatim* in the negative, we affirm the district court's denial of tuition refunds.

During the ratification process of the United States Constitution, and subsequent thereto, the sovereign states of this fledgling nation were concerned with the prospect that federal constitutional authority might be construed to allow suits against the states in federal courts when brought by a citizen of another state or foreign country.[8] These fears were soon realized in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). *Chisholm* held that under the language of the Constitution and of the Judiciary Act of 1789 a state could be sued by a citizen of another state or foreign country. Reaction was swift and immediate. Barely five years later, in 1798, the Eleventh Amendment was ratified by the states.[9] Unaltered since its ratification, the amendment provides simply:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S.Const. Amend. XI.

 The amendment has been judicially construed to bar federal jurisdiction over suits brought against a state by its own citizens, despite the absence of language to that effect.[10] It also has been construed to encompass a suit brought by a foreign state.[11] This bar, however, does not preclude a suit against the state when brought by the United States.[12] Thus, when speak-

**6.** Cf. *Butler v. Dexter,* —— U.S. ——, 96 S.Ct. 1527, 47 L.Ed.2d 774 (1976) (per curiam).

**7.** See generally Note, *Edelman v. Jordan*: The Case of the Vanishing Retroactive Benefit and the Reappearing Defense of Sovereign Immunity, 12 Hous.L.Rev. 891 (1975).

**8.** See *Principality of Monaco v. Mississippi,* 292 U.S. 313, 321–325, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); *Hans v. Louisiana,* 134 U.S. 1, 12–15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**9.** See C. Jacobs, *The Eleventh Amendment and Sovereign Immunity,* 64–75 (1972).

**10.** *Employees v. Department of Pub. Health & Welfare of Mo.,* 411 U.S. 279, 280, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Parden v. Terminal Ry.,* 377 U.S. 184, 186, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *Hans v. Louisiana, supra,* 134 U.S. at 14–15, 10 S.Ct. 504.

**11.** *Principality of Monaco v. Mississippi, supra,* 292 U.S. at 330–332, 54 S.Ct. 745.

**12.** *United States v. Mississippi,* 380 U.S. 128,

ing of the Eleventh Amendment, the Court really talks in terms of the jurisdiction of federal courts to entertain suits and to grant relief against a state.[13]

### Personal Liability

■ At the outset we hold that the defendant University officials are not personally liable for the excess tuition payments tendered by plaintiffs. Thus, if plaintiffs are to recover, payment must come from defendants in their official capacity.

There is nothing in the record to indicate that defendants acted unreasonably or in a manner outside of their official capacity.[14] Defendants were merely complying with the clear state mandate in collecting out-of-state tuition from these resident aliens. Defendants were not on notice of the statute's unconstitutionality prior to payment and acceptance of the money. They were acting in complete good faith.[15]

### Suit Against the State?

Plaintiffs next urge that for Eleventh Amendment purposes the defendants are not state entities and therefore the Eleventh Amendment is inapplicable. The initial defendants were the President of Mississippi State University and the Assistant to the Vice President for Business Affairs at the University. The district court, on its own motion, joined the Board of Trustees as a party defendant. 379 F.Supp. at 1180. *See* Fed.R.Civ.P. 19(a). We cannot agree with plaintiffs' contention, because on our reading of the case law we are convinced that, effectively, the state is the true defendant to this suit.

■ By its own language the Eleventh Amendment indicates that a state must be sued before the bar to suit in federal court applies. The state must be a real or, at least, a nominal defendant.[16] It is not necessary for the state to be actually named in the suit. It is enough that, in effect, the suit is against the state and any recovery will come from the state.[17]

■ To make this determination, the Court must decide whether the suit is for all practical purposes against the state.[18] In *Hander v. San Jacinto Jr. College*, 519 F.2d 273 (5th Cir.), *reh. denied*, 522 F.2d 204 (5th Cir. 1975), this Court affirmed the district court's award of back pay for a wrongfully discharged teacher. The Court recognized that a back pay award was the type of retroactive relief prohibited by *Edelman v. Jordan, supra*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[19] Nonetheless, an Eleventh Amendment challenge was bypassed in the suit against the governing

---

140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965).

**13.** *See Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 467, 65 S.Ct. 347, 89 L.Ed. 389 (1945); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3254, at 79–80 (1975).

**14.** *See Poindexter v. Greenhow*, 114 U.S. 270, 288–290, 5 S.Ct. 903, 29 L.Ed. 185 (1885) (Virginia Coupon Cases). *Cf. Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Sapp v. Renfroe*, 511 F.2d 172 (5th Cir. 1975).

**15.** *Cf. Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**16.** *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824).

**17.** *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 576–577, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Ford Motor Co. v. Depart-*

ment of Treasury, supra, 323 U.S. at 464, 65 S.Ct. 347; *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 50–51, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). *See Worcester County Trust Co. v. Riley*, 302 U.S. 292, 296–298, 58 S.Ct. 185, 82 L.Ed. 268 (1937); *Ex parte The State of New York*, 256 U.S. 490, 500–503, 41 S.Ct. 588, 65 L.Ed. 1057 (1921).

**18.** *Aerojet-General Corp. v. Askew*, 453 F.2d 819, 828–829 (5th Cir. 1971), *cert. denied*, 409 U.S. 892, 93 S.Ct. 110, 34 L.Ed.2d 149 (1972). *See Ex parte The State of New York, supra*, 256 U.S. at 500, 41 S.Ct. at 590 ("[T]he question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record.").

**19.** *See Fitzpatrick v. Bitzer*, 519 F.2d 559 (2d Cir.), *cert. granted*, —— U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d —— (1975).

junior college districts on the ground that under the peculiar Texas statutory and decisional law, the suit was not against the state.[20] The junior college districts in *San Jacinto* were "primarily local institutions, created by local authority and supported largely by local revenues." 519 F.2d at 278. Thus, under the established law that local governmental institutions may not stand in the same light as the state for Eleventh Amendment purposes, there was no bar to the suit.[21] What preserved jurisdiction in *San Jacinto* will not, however, assist the plaintiffs here. Under the instant facts, it is clear from statutory and decisional law that the State of Mississippi is the real party defendant.[22] The district court implicitly recognized this when it stated,

> Nor is there any question but that the refunds, if ordered, would not be paid by the defendants from personal funds, but would necessarily be a charge upon the state treasury, or at least that portion of the fisc dedicated to higher education.

379 F.Supp. at 1188.

The genesis of Mississippi State University (M.S.U.) is found in Chapter XIX of the Laws of the State of Mississippi, approved February 28, 1878. The school was first known as the Agricultural and Mechanical College of the State of Mississippi. Laws of Mississippi, ch. XIX, § 2.[23] Overseeing the school was a Board of Trustees appointed by the Governor with the advice and consent of the state senate. *Id.* § 3. The Board was declared to be a body politic and corporate, capable of suing and being sued. *Id.* § 5. The Governor was the *ex officio* president. *Id.* § 6. The State Treasurer was the *ex officio* treasurer, empowered to keep and disburse all moneys of the school according to the orders of the Board. *Id.* § 8. Later, Mississippi's universities were

placed under the control of the Board of Trustees of state institutions of higher learning.[24] The Agricultural and Mechanical College of Mississippi logo was changed to Mississippi State University by statute, although the school retained "all its property and the franchises, rights, powers, and privileges heretofore conferred on it by law [1878 Act] . . . ." Miss.Code Ann. § 37–113–3 (1972).

Under state law Mississippi is inextricably involved in all facets of the Board's operation of the University, as well as the operation of other schools comprising the state's higher institutions of education. *See* Miss.Code Ann. § 37–101–1 (1972). The Board's structure is detailed in the Mississippi Constitution. In part, the provision provides:

> Such Board shall have the power and authority to elect the heads of the various institutions of higher learning, and contract with all deans, professors and other members of the teaching staff, and all administrative employees of said institutions for a term not exceeding four years; but said Board shall have the power and authority to terminate any such contract at any time for malfeasance, inefficiency or contumacious conduct, but never for political reasons.
>
> Nothing herein contained shall in any way limit or take away the power of the Legislature' had and possessed, if any, at the time of the adoption of this amendment, to consolidate or abolish any of the above named institutions.

Miss.Const. Art. 8, § 213–A. The general powers and duties of the Board are prescribed in § 37–101–15 of the Mississippi statutes. The Board exercises control, distribution and disbursement "of all funds,

---

**20.** *See Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928, 929 (5th Cir. 1975), *cert. filed,* 44 U.S.L.W. 3686 (U.S. June 1, 1976) (No. 75–1710) (county school system in Mississippi).

**21.** *See Edelman v. Jordan, supra,* 415 U.S. at 667 n.12, 94 S.Ct. 1347; *Lincoln County v. Luning, supra,* 133 U.S. at 529, 10 S.Ct. 363 (1890); *Young v. Hutchins,* 383 F.Supp. 1167, 1179–1180 n.19 (M.D.Fla.1974).

**22.** *Accord, Hamilton Mfg. Co. v. Trustees of the State Colleges in Colo.,* 356 F.2d 599 (10th Cir. 1966), for a similar result.

**23.** *See* Miss.Code Ann. § 37–113–3 (1972).

**24.** *See* Miss.Code Ann. § 6718 *et seq.* (1942).

appropriations and taxes, . . . levied and collected, received, or appropriated . . . ." Miss.Code Ann. § 37–101–15(a) (1972). It also has the power to authorize employees to sign vouchers for the disbursement of funds. According to documentations provided in a post argument memorandum submitted by defendants' counsel, M.S.U. is classified as a Group I university. This means that the University is allowed to request up to 72% of its total budget from state appropriations. Requests for such funds are made through the Board as the clearing house for legislative appropriations. The Board disburses the funds to the state university system by an allocation-of-funds formula. Thus, it appears that all appropriations must first be funnelled through the Board. The Board's supervision over the University's budget is complemented by the state's control over the Board's supervision.

Section 37–101–15(d) provides that the Board shall maintain a uniform system of recording and accounting. This system must be approved by the state Department of Audit. It prepares an annual report submitted to the legislature that details "the disbursements of all moneys appropriated to the respective institutions." *Id.* § 37–101–15(e). The report must also show a summary of gross receipts and disbursements. This necessarily covers not only the funds appropriated by the legislature, but would also include self-generating funds. These funds include all student fees collected, grants, sponsored research, income from endowment interest that may accrue to an institution, and the like. Important to note is a provision that illustrates both the Board's control over M.S.U.'s fiscal policy and the ultimate supervision of the Board by the state legislature.

> The board *shall* keep the annual expenditures of each institution herein mentioned within the income derived from legislative appropriations *and other sources*, but in case of emergency arising from acts of providence, epidemics, fire or storm with the written approval of the governor and by written consent of a majority of the

senators and of the representatives it may exceed the income.

*Id.* § 37–101–15(e) (emphasis added).

Related to this is another statutory provision detailing the procedure by which the Board submits the budget of each institution to the state's Commission of Budget and Accounting. Section 27–103–29(g) directs the Board to submit the annual budget prior to the beginning of each fiscal year. The Commission approves the budget if sufficient funds will be available to meet the requests. If not, requests must be justified to the Commission or some sort of compromise worked out. Only then is the budget approved. "The total amount approved for each institution shall constitute the maximum funds which may be expended during the fiscal year." Miss.Code Ann. § 27–103–29(g).

This statutory scheme clearly demonstrates the State of Mississippi's control over the fiscal policies established by the Board, and *a fortiori* over the finances of M.S.U. There has not been cited and we have not discovered any state statute providing refund procedures for overpayment of out-of-state tuition fees. *Cf.* Miss.Code Ann. § 27–73–1 *et seq.* (tax refund statutes).

Thus, there are no facts in this case that would allow application of the *San Jacinto* rationale. Mississippi statutes do provide that counties meeting certain qualifications are authorized to contribute funds toward the construction and equipping of M.S.U. educational facilities within that county. Miss.Code Ann. § 37–113–43 (1972). These funds, however, do not give the county any rights to the facilities, *id.* § 37–113–49, and the funds are deposited into a special fund in the state treasury. *Id.* § 37–113–47.

State decisional law confirms that the Board and the University are part and parcel of the state. *Coleman v. Whipple*, 191 Miss. 287, 2 So.2d 566 (1941), involved a suit to construe a will and cancel certain bequests to three Mississippi universities. In determining whether the state fell within the statute prohibiting charitable bequests, the court had to inquire whether the uni-

versities were one and the same with the state. In discussing the nature of the Board, the court stated:

They were the managing board or head of the university, and then and now constitute the University of Mississippi, created by the State through its legislature which, under its act of creation (Sec. 5) retains the right to repeal the entire act; its property is owned by the State and the university is as an arm of the State, the State itself.

This is also true for M.S.U.

The acts creating the colleges now known as Mississippi State College [renamed Mississippi State University] (February 28, 1878) . . . must be similarly construed, and such construction is not at all affected by Chapter 127 of the Laws of 1932, creating a single board of *trustees for all the state institutions of higher learning.*

2 So.2d at 567 (emphasis added).

In *Smith v. Doehler Metal Furniture Co.,* 195 Miss. 538, 15 So.2d 421 (1943), Mississippi Southern College was joined as a party defendant in a suit to recover a debt. The president of the college and its financial secretary were also defendants, a situation similar to the case at bar. The court seemed to recognize that the Board of Trustees would not have to answer suits absent express waiver of its immunity as a state agency. 15 So.2d at 421–422. Plaintiffs sought payment from a separate fund, "Mississippi Southern College Student Fund," which contained student fees paid over the preceding two to three years. Despite this, the court stated that the funds were public, not private. Once collected by the college officers, officials such as defendants in the case *sub judice,* the moneys became public funds "as to which the officers were responsible solely to the college and to the trustees, and to no private per-

son whomsoever." 15 So.2d at 422. Thus, in *Smith* the fees were not subject to attachment. The same principle must apply *a fortiori* in the instant case where there was no separate fund for student fees.

 The Eleventh Amendment was fashioned to protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty. Retroactive monetary relief for the constitutional violations here would have just that effect.[25] Mississippi has devised a complex statutory design which governs the state's schools of higher education and their control by the Board of Trustees. The Board is required to submit budgetary proposals for legislative acceptance. To require refund payments from the Board for overpayment of tuition fees would be the kind of tampering the Eleventh Amendment sought to avoid.

 These fees appear to have been commingled with all moneys held by the University.[26] Moreover, these types of fees were factored into the preparation of the annual budget for M.S.U. and were relied upon by the state legislature in determining the maximum amount of expenditures allowed. To compel payment would be to add an expenditure not figured in the budget. The fact that the sum is small, $3,495.00, compared to the overall University budget does not affect the determination. The Eleventh Amendment bar is not contingent on the magnitude of the monetary award sought against the state.[27]

### Waiver of Immunity

On oral argument plaintiffs urged that this case is indistinguishable from *Soni v. Board of Trustees of the Univ. of Tenn.,* 513 F.2d 347 (6th Cir. 1975); *cert. denied,* —— U.S. ——, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). In *Soni,* the Sixth Circuit awarded

---

**25.** *See generally* Note, *Attorneys' Fees and the Eleventh Amendment,* 88 Harv.L.Rev. 1875, 1877–1882 (1975).

**26.** *Cf. Schiff v. Williams,* 519 F.2d 257, 262 (5th Cir. 1975) (fees held in separate fund said to be

private moneys and not property of the State of Florida).

**27.** *Cf.* Note, *Attorneys' Fees and the Eleventh Amendment,* 88 Harv.L.Rev. 1875, 1881–1882 (1975).

back pay to a university professor in the face of Eleventh Amendment contentions. Although the *Soni* record was incomplete on the issue of the University's identity as a state instrumentality, the court assumed without deciding that a suit against the University was a suit against the State of Tennessee. The court went on to hold, however, that there had been a waiver of federal court immunity based upon the University's charter, which read:

> The said trustees and their successors by the name aforesaid, may sue and be sued, plead and be impleaded, in any court of law or equity *in this State or elsewhere.* (emphasis added).

513 F.2d at 351. The *Soni* court found this to be a clear waiver of Tennessee's right not to be sued in federal court.

 The principles guiding our determination on this issue are well settled. Waiver of the state's constitutional immunity must appear clearly and will not be easily implied.[28] An immunity waived for state suit purposes does not necessarily waive immunity for federal courts.[29]

 There is nothing in the present record to indicate that Mississippi clearly intended to waive its Eleventh Amendment immunity.[30] The sweeping state statutory language of waiver which controlled *Soni* is not equalled in this case. Section 5, chapter XIX of the 1878 Act simply provided that the Board could sue and be sued. No reference was made to any specific court. Section 5 provided:

> That each of the board of trustees herein provided for, and their successors in office, be and the same are hereby declared to be a body politic and corporate by their respective names and styles, and shall have a common seal, and each in its own name; *shall sue and be sued,* contract and be contracted with, and may own, purchase, sell and convey property, both real, personal and mixed. (emphasis added).

This "sue and be sued" terminology has not, however, been carried into the present statutes. There is no equivalent of section 5 in the new statutes. No mention is made of the power to sue or to be sued either in the organizational statutes or in the general powers and duties of the Board.[31] Under specific circumstances the Board is allowed to sue or be sued.[32] In these instances, however, the waiver is limited to a narrowly defined activity. The consent to be sued is not given with such clarity as to amount to a waiver of Eleventh Amendment protection. As the Supreme Court stated in *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959):

> [W]here a public instrumentality is created with the right "to sue and be sued" that waiver of immunity in the particular setting may be restricted to suits or proceedings of a special character in the state, not the federal, courts.

*Id.* at 277, 79 S.Ct. at 787.

 In the statutes concerning Mississippi State University, there is no provision

---

**28.** *Edelman v. Jordan, supra,* 415 U.S. at 673, 94 S.Ct. 1347; *Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275, 276, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

**29.** *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 172, 29 S.Ct. 458, 53 L.Ed. 742 (1909); *Chandler v. Dix,* 194 U.S. 590, 591–592, 24 S.Ct. 766, 48 L.Ed. 1129 (1904); *Scott v. Board of Supervisors of L.S.U.,* 336 F.2d 557, 558 (5th Cir. 1964).

**30.** *Accord, Hamilton Mfg. Co. v. Trustees of the State Colleges in Colo., supra,* 356 F.2d at 601–602, wherein the Tenth Circuit reached a similar result based on a functionally equivalent Colorado statute.

**31.** *See* Miss.Code Ann. §§ 37–101–3, 37–101–7, 37–101–15 (1972).

**32.** *See* Miss.Code Ann. §§ 37–101–45 (1972) (personal and corporate lessees leasing land for construction of housing and dormitory facilities by private financing may enforce or protect their rights by suit at law or in equity); 37–101–63 (1972) (nonprofit corporations for purpose of acquiring or constructing facilities for higher education, as established by Board resolution, can sue and be sued and defend suits against it).

comparable to section 5 of the 1878 Act.[33] Only § 37–113–3 could be construed as referring back to any form of consent that may have been present in prior acts. In referring to the 1878 Act, this section states in part:

[Mississippi State University] shall continue to exist as a body-politic and corporate, . . . with all its property and the franchises, rights, powers, and privileges heretofore conferred on it by law, or properly incident to such a body and necessary to accomplish the purpose of its creation[.]

This provision likewise lacks the clarity needed in order to infer the state's consent to be sued. As the Supreme Court has often stated,

Th[e] cases declare the rule that clear declaration of a State's consent to suit against itself in the federal court on fiscal claims is required.

*Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 577, 66 S.Ct. 745, 747, 90 L.Ed. 862 (1946). Clear expression is lacking here.

Our holding that there is no Mississippi statute consenting to suit is buttressed by state decisional law. *Smith v. Doehler Metal Furniture Co., supra*, 195 Miss. 538, 15 So.2d 421 (1943), involved Mississippi Southern College, a sister school of M.S.U. but subject to the same statutory control and Board supervision. The state Attorney General argued that the school was an agency of the state and that there was no statutory consent for the suit. The Mississippi Supreme Court agreed.

That an arm or agency of the state cannot be sued except by express statutory or constitutional authority has been too long and too well settled to be further debatable now, and this includes, of course, suits under the attachment in chancery statutes. An institution such as this College is entrusted only to men of high character, and they, in turn, are under the supervision of a state-wide board of trustees, selected from among the most reputable citizens of the state.

The legislature has evidently considered that such men would be as sensitive to every financial obligation of the institution and as alert to preserve its financial integrity as would any court or jury, and that since the principal field of effort of such an agency is other than business, it should not have its energies diverted by standing attendance upon litigation.

15 So.2d at 421–422. In *State v. Sanders*, 203 Miss. 475, 35 So.2d 529 (1948), the court was seemingly speaking to the instant situation where recovery of excess tuition payments would necessarily be paid from the state treasury. In *Sanders* the court stated:

Thus it will be found, . . . that nearly all the cases, wherein the rule of immunity from suit against the state, or a subdivision thereof, has been applied and upheld, are those which demanded a money judgment, and wherein the discharge of the judgment, if obtained, would require an appropriation or an expenditure therefrom, which being legislative in its character is a province exclusively of the political departments of the state.

35 So.2d at 532–533.

This result is identical to a post-*Soni* decision of the Sixth Circuit in *Long v. Richardson*, 525 F.2d 74 (6th Cir. 1975). There former law students sought a money judgment against Memphis State University for out-of-state tuition fees paid while they were in school. The plaintiffs in *Long* were after the same kind of relief as the Jagnandans. The court held that the suit was barred by the Eleventh Amendment since Tennessee had not clearly waived its immunity for Memphis State University, unlike the situation in *Soni*. Thus, in the case *sub judice* where no clear expression of waiver has been found, *Soni* would not be controlling.

### *Edelman v. Jordan*

Plaintiffs contend that the refunding of previous excess tuition payments is not pro-

---

**33.** *See* Miss.Code Ann. § 37–113–1 *et seq.* (1972).

scribed by the Supreme Court analysis of the Eleventh Amendment in *Edelman v. Jordan, supra,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). They further argue that this type of refund is more in the nature of equitable restitution and therefore different from the retroactive welfare benefits denied in *Edelman.* We disagree.

The United States Supreme Court has never specifically addressed the problem of refunded excess tuition payments *vis-a-vis* the Eleventh Amendment. The pre-*Edelman* case of *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), aff'g, 346 F.Supp. 526 (D.Conn.1972), does not support plaintiffs' effort to bypass the Eleventh Amendment. It is true that *Vlandis* affirmed the refunding of excess out-of-state tuition fees paid by students who were in fact Connecticut residents. The primary issue in *Vlandis* concerned state statutes creating irrebuttable presumptions of nonresidency. The Court found these to be violative of due process.

In *Vlandis,* however, the Eleventh Amendment issue was never briefed nor argued to the Court and was not discussed in the Court's opinion.[34] The Court in *Edelman* disavowed prior cases which had granted monetary relief against the state without consideration of Eleventh Amendment ramifications.[35] Although *Vlandis* was not specifically named by the Court as being among this group, we do not read the omission as indicating the Court's approval of refunding tuition fees in the face of Eleventh Amendment contentions. Since *Edelman,* and not *Vlandis,* fully explored the Eleventh Amendment area, it is *Edelman* which must necessarily control our decision in the case before us. The status of *Vlandis* is thus similar to that of *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). There the Supreme Court affirmed the granting of retroactive

welfare benefits without mention of the Eleventh Amendment. The Court in *Edelman* explicitly disapproved *Shapiro* to the extent it conflicted with *Edelman's* Eleventh Amendment holding.

*Edelman* negates any sustenance which plaintiffs might get from the watershed case of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court there held that the Eleventh Amendment did not bar a federal court from enjoining the Attorney General of Minnesota from enforcing a statute found to be in violation of the Fourteenth Amendment. To reach this result, *Ex parte Young* rested upon a fiction.[36] Since the officer was seeking to enforce an unconstitutional statute, that officer lost his cloak of state authority. At that point he began to operate without the official sanction of the state. This logically followed from the proposition that the state could not enforce an unconstitutional act.

[T]he use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.

209 U.S. at 159–160, 28 S.Ct. at 454. Thus it became not a suit against the state at all. The officer was affirmatively enjoined to

**34.** See 41 U.S.L.W. 3263 (U.S. Nov. 7, 1972).

**35.** See Sterrett v. Mothers' & Children's Rights Org., 409 U.S. 809, 93 S.Ct. 68, 34 L.Ed.2d 70 (1972); State Dept. of Health & Rehabilitative Services of Fla. v. Zarate, 407 U.S. 918, 92 S.Ct. 2462, 32 L.Ed.2d 803 (1972), aff'g, 347 F.Supp.

1004 (S.D.Fla.1971); Gaddis v. Wyman, 304 F.Supp. 717 (N.D.N.Y.1969), aff'd per curiam sub nom., Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970).

**36.** See C. Wright, Handbook of the Law of Federal Courts § 48, at 186 (2d ed. 1970).

conform his conduct to constitutional requirements.

*Edelman* likewise involved a suit for injunctive relief against state officials for violation of federal regulations and the Fourteenth Amendment in administering the federal-state program of Aid to the Aged, Blind or Disabled. On the merits, the district court held the federal regulations to have been violated. The court ordered defendants to release and remit past benefits wrongfully withheld. The court of appeals affirmed. The Supreme Court affirmed as to the illegality of the action of the state officials. As to the damage issue, however, the Court held that ordering the remittance of retroactive benefit payments by the federal court was barred by the Eleventh Amendment. 415 U.S. at 658–659, 94 S.Ct. 1347.

Noting that in reality the benefits award by the district court would be paid from the general revenues of the State of Illinois, the *Edelman* Court held that

> a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.

415 U.S. at 663, 94 S.Ct. at 1356.

Thus, although *Ex parte Young* would support the injunctive relief ordered in this case, *Edelman* clearly bars financial relief against public funds. Since it is clear that any repayment of past tuition costs would necessarily come from state funds, we affirm the three-judge district court's refusal to grant the refund. Our conclusion corresponds to that of the Sixth Circuit in a similar case which involved the refunding of tuition fees. *See Long v. Richardson, supra,* 525 F.2d at 75–76.

In its most recent decision on the Eleventh Amendment, the Supreme Court in *Fitzpatrick v. Bitzer,* —— U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d —— (1976) left unquestioned its holding in *Edelman v. Jordan.* Although *Fitzpatrick* permitted recovery of retroactive retirement benefits wrongfully withheld from plaintiffs on the basis of sex discrimination, that case is not controlling. Different from the case at bar

was the presence in *Fitzpatrick* of federal legislation authorizing federal courts, under Title VII, to award money damages in favor of private individuals and against a state found to have discriminated in employment on the basis of race, religion, color, sex or national origin. —— U.S. at ——, 96 S.Ct. 2666. *See* 42 U.S.C.A. § 2000e–2(a). This legislation had been passed pursuant to § 5 of the Fourteenth Amendment. Similarly in *Edelman* there was no express congressional legislation. Thus *Fitzpatrick* found a situation wholly unpresent in *Edelman.* The Court in *Fitzpatrick* indicated that without this particular legislation the case would be governed by *Edelman. But cf. National League of Cities v. Usery,* —— U.S. ——, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

> Both parties in the instant case agree with the Court of Appeals that the suit for retroactive benefits by these parties is in fact indistinguishable from that sought to be maintained in *Edelman,* since what is sought here is a damage award payable to a private party from the state treasury.

*Fitzpatrick v. Bitzer,* —— U.S. at ——, 96 S.Ct. at 2669 (footnote omitted).

Plaintiffs additionally argue that this is really a suit for equitable restitution and is therefore not barred by the Eleventh Amendment. Plaintiffs reason that, unlike the welfare benefit cases, repayment of these tuition fees is not akin to a damage claim but merely prevents unjust enrichment of the University. The excess fees would never have been collected but for the unconstitutional statute. *Edelman's* reliance on *Ford Motor Co. v. Department of Treasury, supra,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), forecloses acceptance of plaintiffs' argument.

*Ford Motor Co.* was an unsuccessful suit by a nonresident plaintiff for refund of gross income taxes paid the Indiana Department of Treasury. Like the excess tuition payments involved *sub judice,* the taxes were moneys paid by the taxpayer.

The two issues before the Court in *Ford Motor Co.* involved whether the suit was

against the state, and whether Indiana consented to be sued. The Court ruled the suit to be against the state but held there had been no consent to suit. The opinion did not explicitly discuss whether a claim for equitable restitution could withstand an Eleventh Amendment challenge. In *Edelman*, however, *Ford Motor Co.* was cited as answering that question negatively.

> The term "equitable restitution" would seem even more applicable to the relief sought in that case [*Ford Motor Co.*], since the taxpayer had at one time had the money, and paid it over to the State pursuant to an allegedly unconstitutional tax exaction.

*Edelman v. Jordan, supra*, 415 U.S. at 669, 94 S.Ct. at 1358.

*Ford Motor Co.* on its own might very well not support a broad denial of equitable restitution. The *Edelman* Court, however, construes that case to preclude such relief in spite of the inequities inherent in such a denial.

The Third Circuit has recently decided a case that on its face appears directly contrary to the Eleventh Amendment result reached on this appeal. *Samuel v. University of Pittsburgh*, 538 F.2d 991 (3rd Cir. 1976). Investigation below the surface of *Samuel* indicates that the case is inapposite to the appeal *sub judice.* The court in *Samuel* affirmed the granting of injunctive relief against defendant universities and state officials preventing the enforcement of a statewide residency rule on grounds of its unconstitutionality. That rule, for tuition purposes, required that the domicile of the wife is considered that of her husband's. The court also affirmed the district court's holding the universities liable for equitable restitution for the difference between the higher out-of-state tuition fees paid by married women residents because of the unconstitutional residency rule and the lesser in-state tuition charges.

A review of the district court's decision explains the apparent inconsistency between *Samuel* and the instant case. *Samuel v. University of Pittsburgh*, 375 F.Supp. 1119 (W.D.Pa.1974). Three universities involved in the suit included the University of Pittsburgh, Temple University and Penn State University. The district court at length explored the relationship between the three universities and the Commonwealth of Pennsylvania.[37] This argument was rejected. The district court found the universities not to be state instrumentalities.[38] As was documented in the *Suit. Against the State?* section of this opinion, unlike the universities involved in *Samuel*, M.S.U. is one and the same with the State of Mississippi. Therefore the cosmetic similarity between these two cases does not withstand analysis. In the notation of issues involved in the *Samuel* appeal the court made no mention of a challenge to the

---

**37.** *Samuel v. University of Pittsburgh*, 375 F.Supp. 1119 (W.D.Pa.1974). The court explored the nature of these universities for purposes of determining their relation to the state under 42 U.S.C.A. § 1983. All three universities were found to be "persons" under § 1983.

> Close and conscientious scrutiny of the above figures [setting out the financial picture of each university], and of the other indicia of state control or lack thereof set out above, make it clear that Pitt and Temple are actually and statutorily possessed of sufficient independence from the control of the Commonwealth to constitute persons within the meaning of Section 1983.
>
> * * * * * *
>
> Under this state of facts, this Court finds that the Commonwealth does not exercise such actual or potential control over the operations of Penn State as to render that insti-

tution a state instrumentality as that term is meant in a Section 1983 context.
375 F.Supp. at 1127.

**38.** Only if the defendant universities were deemed to be state instrumentalities could they be held to enjoy sovereign immunity. The status of each of the three defendant universities has been discussed and described in some detail in the preceding section hereof *and none of them have been found to be state instrumentalities. Each of the defendant universities has been found to be an essentially private institution, insofar as the term "private" connotes an absence of state control over its operation.* Since the three universities function autonomously from the state and have been found to be persons under Section 1983, the defense of sovereign immunity is unavailable to them.
375 F.Supp. at 1128. (emphasis supplied).

district court's findings as to the universities' private status. The Third Circuit found the universities to be liable for restitution:

> The [district court] found that the Universities were unjustly enriched in that they wrongfully secured a benefit which it would be unconscionable for them to retain. We agree with this conclusion.[39]

538 F.2d at 994. In light of the district court's extensive discussion of the essentially private nature of the universities, and the Third Circuit allowing restitution from those universities, it cannot be said that *Samuel* contravenes those principles relied on in the instant case.

Finally, the case of *Atchison T. & S. F. Ry. v. O'Connor,* 223 U.S. 280, 32 S.Ct. 216, 56 L.Ed. 436 (1912), is of no help to plaintiffs. *Atchison* simply was not an equitable restitution case because, as the Court noted, state law provided that

> "if it shall be determined in *any action* at law or in equity that any corporation has erroneously paid said tax to the Secretary of State," upon the filing of a certified copy of the judgment the auditor may draw a warrant for the refunding of the tax and the state treasurer may pay it. We must presume that a judgment in the present action would satisfy the law. (emphasis added).

*Id.* at 287, 32 S.Ct. at 218. Thus in *Atchison* recovery was based on a state statutory

right where the statute effectively waived any Eleventh Amendment bar by the provision that *any* court judgment would effect repayment of taxes. Such is not the case here.

### *Effect of Fourteenth Amendment Violation on Eleventh Amendment Immunity*

In their final argument plaintiffs contend that the Eleventh Amendment does not bar recovery for this Fourteenth Amendment violation. Plaintiffs argue that the earlier enacted Eleventh Amendment (adopted 1798)[40] must give way to the Fourteenth Amendment (adopted 1868)[41] which protects individuals against state encroachment upon their rights to due process and equal protection of the laws. The major portion of plaintiffs' brief deals with this argument.

The three-judge court rejected this argument and held that the Eleventh Amendment barred recovery of excess tuition payments. In reaching this conclusion the court relied upon *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It recognized that although *Edelman* did not rest upon Fourteenth Amendment grounds,

> the sweep of the majority opinion [in *Edelman*] apparently leaves no room for distinguishing money demands made against a state because of Fourteenth

---

**39.** Defendants in *Samuel* also included state officials and university officials. The state officials argued that the Eleventh Amendment immunity prevented a suit against them for injunctive and declaratory relief. This argument was rejected on the basis of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). 375 F.Supp. at 1129. The court held that defendant state officials were not liable for restitutionary payments. *Id.* at 1135. The court, moreover, rejected the notion that once state officials were enjoined in federal court despite the Eleventh Amendment may also be liable for restitution. The court cited *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) as to the same effect. 375 F.Supp. at 1135 n.17.

As to defendant university officials the court stated that they were not state agents since the schools that employed them were not state

instrumentalities. The court also noted that these individuals "are not personally liable themselves for restitution . . . ." 375 F.Supp. at 1135 n.18.

**40.** The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

**41.** The Fourteenth Amendment provides:

Section 1. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Amendment transgressions, at least in such areas, as here, where Congress had not passed enforcement legislation specifically directed against a state or states pursuant to Section 5 of the Amendment. 379 F.Supp. at 1189. Accordingly, the court held that

> [w]ithout specific guidance from the Supreme Court, we hold that the issue of ordering refunds to plaintiffs is foreclosed and no longer an open question, despite the footnote observation in Justice Marshall's dissent.

*Id.* at 1189.[42]

Of course, *Edelman* does not hold that the Eleventh Amendment absolutely proscribes all monetary relief against a state in a federal court, even in Fourteenth Amendment cases. Insofar as one Amendment may override the other, the question was left open in *Edelman,* as Justice Marshall recognized in his dissent.[43] *Edelman* is not, however, eliminated as an instructional device in attempting to come to grips with the sensitive constitutional issue raised by plaintiffs' arguments. The *Edelman* Court expressly overruled, as being inconsistent with the Eleventh Amendment, a series of Fourteenth Amendment cases allowing assessment of damages against the state.[44]

In *Prout v. Starr,* 188 U.S. 537, 23 S.Ct. 398, 47 L.Ed. 584 (1903), the plaintiffs obtained an injunction against the state attorney general's enforcement of an allegedly unconstitutional statute, arguing that they would otherwise suffer loss of property without due process of law. The court affirmed the injunction. The Eleventh Amendment was asserted as a defense. In an approach similar to that taken later in *Ex parte Young,* 209 U.S. 123, 28 S.Ct.

441, 52 L.Ed. 714 (1908), the *Prout* Court stated that when a state officer attempts to enforce an unconstitutional statute, a suit against him "is not a suit against the State within the meaning of that amendment." 188 U.S. at 543, 23 S.Ct. at 400. *See Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). In discussing the relationship of the Eleventh Amendment with other constitutional amendments, the Court worked from the basic premise that

> [t]he Constitution of the United States, with the several amendments thereof, must be regarded as one instrument, all of whose provisions are to be deemed of equal validity.

*Id.* 188 U.S. at 543, 23 S.Ct. at 400. Consequently, the Court recognized that one of its important functions is to interpret the various provisions and limitations of the Constitution so "that each and all of them [should] be respected and observed." *Id.* at 544, 23 S.Ct. at 401.

In *Ex parte Young, supra,* the Court again recognized this constitutional tension but did not have to resolve the issue in deciding that case. The Court, however, did state that

> [w]e may assume that each [the Eleventh and Fourteenth Amendments] exists in full force, and that we must give to the Eleventh Amendment all the effect it naturally would have, without cutting it down or rendering its meaning any more narrow than the language, fairly interpreted, would warrant.

*Id.* 209 U.S. at 150, 28 S.Ct. at 450. *See* C. Wright, *Handbook of the Law of Federal Courts,* § 48, at 185 (2d ed. 1970).

The exact parameters of the Eleventh Amendment, when juxtaposed with

---

**42.** Justice Marshall stated in his dissent in *Edelman,*

> [i]t should be noted that there has been no determination in this case that state action is unconstitutional under the Fourteenth Amendment. Thus, the Court necessarily does not decide whether the States' Eleventh Amendment sovereign immunity may have been limited by the later enactment of the Fourteenth Amendment to the extent that such a limitation is necessary to effectuate the purposes of that

Amendment, an argument advanced by an *amicus* in this case. In view of my conclusion that any sovereign immunity which may exist has been waived, I also need not reach this issue. 415 U.S. at 694 n.2, 94 S.Ct. at 1371.

**43.** *See* note 42 *supra.*

**44.** *See Edelman v. Jordan, supra,* 415 U.S. at 670–671 and n.13, 94 S.Ct. 1347. *See also* note 35 *supra.*

the Fourteenth Amendment, do not appear to have been considered before by this Court. *See Mobil Oil Corp. v. Kelley,* 493 F.2d 784, 786–787 n.1 (5th Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *Louisiana State Bd. of Educ. v. Baker,* 339 F.2d 911, 914 (5th Cir. 1964). We conclude, however, that in the case *sub judice,* the Fourteenth Amendment, though ratified last, does not preempt the operation of the Eleventh Amendment's bar against recovery of the excess tuition payments from the state in a federal court. Recognizing the need for a balance of the conflicting Amendments, we find that such a resolution satisfies the interests of both Amendments. The state officials have been enjoined from enforcing an unconstitutional act to the deprivation of the plaintiffs' Fourteenth Amendment rights, and the state's fiscal interest has been preserved under the Eleventh Amendment.

The Supreme Court's recent decision in *Fitzpatrick v. Bitzer,* —— U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d —— (1976), does not alter the result reached in this case. Fitzpatrick brought a class action on behalf of all present and retired male employees working for the State of Connecticut. The complaint charged that certain statutory provisions of Connecticut's retirement benefit plan discriminated against the plaintiffs on the basis of sex in violation of Title VII of the Civil Rights Act of 1964. An injunction issued, but the district court held the

recovery of retroactive benefit payments prohibited by the Eleventh Amendment since they would be paid from the state treasury. On this point the Second Circuit affirmed. *Fitzpatrick v. Bitzer,* 519 F.2d 559 (2d Cir. 1975). The Supreme Court reversed.

The Court held that the Eleventh Amendment may be effectively preempted by congressional legislation enacted pursuant to the enforcement provision of section 5 of the Fourteenth Amendment, which provides:

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

The Court said,

we think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, see *Hans v. Louisiana,* 134 U.S. 1 [10 S.Ct. 504, 33 L.Ed. 842] (1890), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. * * * When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority.

—— U.S. at ——, 96 S.Ct. at 2671.[45] *Fitzpatrick* holds that the balance between

---

**45.** In cases arising prior to *Fitzpatrick,* at least two other Circuits addressed, not for purposes of a court holding, the Fourteenth *vis-a-vis* Eleventh Amendment argument. In *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3d Cir. 1974), the court confronted, *inter alia,* the problem of attorney's fees in a teacher discharge case. Within the case were problems of both First and Fourteenth Amendment dimensions. In footnote 7, the court recognized Justice Marshall's statement of *Edelman* not deciding the Fourteenth Amendment question thus leaving open the effect that Amendment had on the Eleventh. The court, however, thought *Edelman* disposed of the issue. "We think *Edelman* must be read as closing the door on any money award from a state treasury in any category." 501 F.2d at 42–43 n.7. One category to which the court referred was a money claim against the state

based upon the Fourteenth Amendment, which binds the states directly, and upon section 5 of the Fourteenth, which gives Congress the power to create remedies. Part of the remand in that case was for a determination of the College's status to the state. *Skehan,* however, was vacated and remanded by the Supreme Court for further consideration in light of *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *Skehan v. Board of Trustees of Bloomsburg State College,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975). *Jordon v. Gilligan,* 500 F.2d 701 (6th Cir. 1974), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975), concerned a reapportionment challenge on both Fourteenth and Fifteenth Amendment grounds. The court in *Jordon* quoted in the text of the opinion the

the Eleventh and Fourteenth Amendments must be struck in favor of the Fourteenth, when Congress has passed specific legislation pursuant to section 5 to enforce the rights guaranteed by the Fourteenth Amendment. In such cases monetary relief recoverable directly from the state treasury will be allowed.

■ No enforcing legislation is involved in the instant case. The very fact that the *Fitzpatrick* Court relied on legislation, authorized by the enabling section of the Fourteenth Amendment, supports the necessity of such legislation for recovery of money from the state by a person whose Fourteenth Amendment rights have been violated. Authority cited by the Court in *Fitzpatrick* mandates this requirement. *See Ex parte Virginia,* 100 U.S. (10 Otto.) 339, 347, 25 L.Ed. 676 (1880). Language in *Fitzpatrick* further supports this position.

We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. See *Edelman v. Jordan, supra; Ford Motor Co. v. Department of Treasury, supra.*

—— U.S. at ——, 96 S.Ct. at 2671 (footnote omitted). Absent further direction from the Supreme Court, and where no section 5 legislation has been passed, our holding here is in keeping with the historical balance placed upon a coterminous recognition of the Eleventh and Fourteenth Amendments. Whether the Supreme Court would hold that the Fourteenth overrides the Eleventh Amendment, distinguishing *Edel-*

man and *Ford Motor Co.* on the ground that those cases never reached the merits of any Fourteenth Amendment violation, is a determination that must rest with that Court. *Fitzpatrick* concerned only the situation in which section 5 legislation was present. The case of the Jagnandans is therefore dissimilar. Accordingly, we must reject plaintiffs' argument.

We point out, however, that our reading of the current status of Supreme Court determinations on the Eleventh and Fourteenth Amendments might well be affected by the treatment on appeal of a recent three-judge court case. *Mauclet v. Nyquist,* 406 F.Supp. 1233 (W.D.N.Y.), *appeal sub. nom., Rabinovitch v. Nyquist,* 45 U.S.L.W. 3007 (U.S. July 13, 1976) (No. 75–1809). *Mauclet* involved a suit by resident aliens of New York State challenging an education law which required applicants for state financial aid to be a United States citizen, or to have expressed the intent to become such a citizen. The court held the law to be unconstitutional and mandatorily enjoined defendant state officials from enforcing its provisions. On the basis of *Edelman,* the court denied plaintiff Rabinovitch money damages for past assistance moneys withheld by defendants. 406 F.Supp. at 1236. One issue being raised by *Rabinovitch* on appeal is whether the Fourteenth Amendment, of its own force and absent enforcement legislation, constitutes a limitation to the Eleventh Amendment's bar to awarding money judgments against the state in a federal court.[46] With this issue before the Supreme Court, the question is whether we should postpone consideration until *Rabinovitch,* has been decided.

*Skehan* footnote 7, in full, and concluded that *Edelman* precluded an award of attorney's fees against the state. 500 F.2d at 709. By the fact that *Jordon* involved Fourteenth Amendment claims, and its recognition of the potential conflict between the Eleventh and Fourteenth Amendments, it is also apparent that *Edelman* was read as barring any money award from the state treasury.

**46.** The specific issue being raised, as reported, is as follows:

Does Fourteenth Amendment, of its own force, constitute limitation on sovereign immunity bar of Eleventh Amendment so that, even absent specific statutory declaration authorizing money judgment against state in suit brought to enforce Fourteenth Amendment rights, federal court may enter judgment awarding money damages against state where, in its discretion, such relief is necessary and appropriate to fully vindicate constitutional rights and to deter future violations of constitutional proscriptions?
45 U.S.L.W. 3007 (U.S. July 13, 1976).

*Rabinovitch,* however, will not be decided until the next Supreme Court term, so that delay would be significant. In addition, despite the direct issue concerning the Eleventh and Fourteenth Amendments in *Rabinovitch,* the Court may not fully discuss that issue, for the Court in past three-judge court appeals has sometimes found it unnecessary to discuss all issues raised. *See Edelman v. Jordan, supra,* 415 U.S. at 670, 94 S.Ct. 1347. Moreover, the contentions of the Jagnandans have Eleventh Amendment considerations apart from and beyond those being raised in *Rabinovitch.* These other issues, along with interpretation of the Eleventh *vis-a-vis* Fourteenth Amendment, might themselves be reviewed by the Supreme Court in this case in light of the similar issue raised in *Rabinovitch.* Accordingly, we determine it to be more beneficial for all parties concerned to release this decision now.

AFFIRMED.

JOHN R. BROWN, Chief Judge (concurring):

I concur fully in Judge Roney's opinion for the Court and all of the views so ably expressed by Judge Goldberg.

I would add only two things.

First, the term *"pro tanto* repeal" of the Eleventh by the Fourteenth seems unduly harsh. One constitutional provision can in its application be modified without imputing to the great electorate an undisclosed purpose to "repeal" an earlier provision. Responding to our earnest supplication does not present to the High Court the awesome prospect of repeal.

Second, this is in no sense merely an intriguing question to constitutionalists. It is presented in raw form. On today's holding appellants lose all monetary recovery for money which Mississippi now wrongfully retains. Except by the luck of unpredictable timing *Rabinovitch* (or others) may or not afford any realistic relief. Nor will the issue down, as witness our own experience these past two years as we struggle with the Eleventh's restriction on meaningful recompense for often flagrant violations of the Fourteenth. *Gates v. Collier,* 5 Cir., 1973, 489 F.2d 298 (panel), 1975, 522 F.2d 81 (en banc); *Newman v. Alabama,* 5 Cir., 1974, 503 F.2d 1320 (panel), 1975, 522 F.2d 71 (en banc).

GOLDBERG, Circuit Judge, with whom BROWN, Chief Judge joins (concurring).

I concur fully in the excellent opinion authored by my brother Roney. I write separately to voice concerns which render concurrence uneasy, and to emphasize considerations which render concurrence necessary.

The fourteenth amendment exercises a benign and ubiquitous influence on our jurisprudence, and occupies a central position in our society's notions about basic justice. The first section of the fourteenth amendment provides that:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

That language affords clear and unequivocal protection of individual rights against actions of a state. It seems fair to assume that the supporters and ratifiers of the amendment intended that an individual have remedies against a state's abrogation of fourteenth amendment rights sufficient to give those rights meaning as more than a declaration "of the moral duty of the State." *Cf. Ex parte Virginia,* 100 U.S. (10 Otto) 339, 347, 25 L.Ed. 676, 679 (1880). That the Civil War amendments were meant "to serve as a sword, rather than merely as a shield, for those whom they were designed to protect" was confirmed in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662, 673 (1974).

In this case the eleventh amendment is presented as a limit on the full panoply of individual remedies against a state that the

fourteenth amendment might otherwise provide. The eleventh amendment reads:

The judicial power of the United States shall not be construed to extend to any suit at law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[1]

This amendment was adopted to reverse the Supreme Court's 1793 holding in *Chisolm v. Georgia,* 2 U.S. (2 Dal.) 419, 1 L.Ed. 440, that a state was liable to suit in federal court by a citizen of another state. Principal concerns in the ratification of the eleventh amendment included the desire to permit states to retire outstanding Revolutionary War debt without the intervention of federal courts, and the wish to avoid litigation seeking restitution of confiscated Loyalist property or restoration of lands that arguably had been improperly condemned by the states.[2]

That there might be conflict between the vindication of rights protected against the states by the fourteenth amendment and the immunity from suit established for the states by the eleventh amendment is apparent. Situations are easily imaginable (the case at bar is a good illustration) in which the policies embodied in the fourteenth amendment's protection of individual rights against the states must be substantially frustrated if the eleventh amendment is read to provide immunity for the states in regard to any recovery of wrongfully taken money. Appellants in this case have presented arguments based largely on legislative history that the later enacted fourteenth amendment must be seen as a *pro tanto* repeal of the eleventh amendment's

strictures on suits against the state. I find these arguments persuasive.

The Supreme Court has clearly recognized that the fourteenth amendment acts as a limit on the eleventh in some contexts. *Ex parte Young, supra,* relying on the fiction discussed by Judge Roney, found that the fourteenth amendment authorized prospective injunctive relief in a suit effectively against the state. *Fitzpatrick v. Bitzer,* —— U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d —— (1976) demonstrates that the fourteenth amendment has in at least one other significant way carved an exception into the protection that the eleventh amendment would otherwise provide for state fiscs. *Fitzpatrick* holds that proper congressional exercise of its legislative powers under section 5 of the fourteenth amendment can serve to abrogate the states' eleventh amendment immunity.[3] Section 5, then, represents a license for the Congress, in the context of enforcing fourteenth amendment rights of individuals against the states, effectively to repeal the eleventh amendment *pro tanto.*

As Judge Roney indicated, no congressional legislation under section 5 is a factor in this case. The district court nevertheless found that the fourteenth amendment rights of these plaintiffs had been violated by the state. That finding is unchallenged on appeal. The question thus arises whether the fourteenth amendment of its own force acts to modify the eleventh amendment in the context of an individual's suit against a state for money taken from him by the state in violation of the fourteenth amendment.[4] If no self-executing *pro tan-*

---

1. At the time this suit was filed, the Jagnandans were citizens of Guyana, and thus the eleventh amendment was applicable to this suit in its literal terms. *Cf. Fitzpatrick v. Bitzer,* —— U.S. ——, ——, 96 S.Ct. 2666, 2672, 49 L.Ed.2d ——, —— (Brennan, J., concurring in the judgment).

2. *See* C. Jacobs, The Eleventh Amendment and Sovereign Immunity 64–67 (1972); Note, "The Supreme Court, 1973 Term," 88 *Harv.L.Rev.* 43, 243, 246–47 (1974).

3. Section 5 provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

4. As Judge Roney has ably demonstrated, once it is determined that the monetary relief sought here is in effect sought to be recovered from the state, *cf. Mississippi Gay Alliance v. Goudelock,* 536 F.2d 1073, 1084–85 (1976) (Goldberg, J., dissenting), the eleventh amendment strictures reaffirmed in *Edelman* are not avoidable on any ground short of *pro tanto* repeal of the eleventh amendment by the fourteenth amendment. As to waiver, there has been no "clear

*to* repeal can be found, then the full vindication of fourteenth amendment rights must be contingent upon affirmative congressional legislation under section 5.

Were I writing on a clean slate, I would hold that section 5 of the fourteenth amendment is insufficient to insure the full potency of the rights sought to be protected by section 1 of the fourteenth amendment. I have no doubt that the framers and ratifiers of the fourteenth amendment had great faith in the inclination and ability of the federal Congress to enforce the rights guaranteed against the states by the fourteenth amendment. In view of the subsequent interpretations of the fourteenth amendment, however, it would be ironic indeed were the full vindication of the rights guaranteed against the states to be seen as contingent upon affirmative legislative action of "The State."

The fourteenth amendment, through the constitutional history of our country, has demonstrated great absorptive powers. That amendment is properly read today as having incorporated, for the protection of the individual against the state, the fundamental rights enumerated in the Bill of Rights. Thus, the fourteenth amendment protects individuals against, *inter alia,* the same types of arbitrary and unfair acts on the part of state government that originally prompted the Bill of Rights' protection for individuals against the federal government. The Congress cannot realistically be expected to provide fully adequate remedies for every fourteenth amendment violation, because such violations often reflect the type of overreaching that tempts all governments. Accordingly, the fourteenth amendment's promise of full protection of individual rights might remain unfulfilled in many cases were section 5 the only path around the limitations of the eleventh.

The conflict between the fourteenth and the eleventh amendments should not be understood only as a question of allocation of powers between the state and federal sovereigns. Although it is clearly appropriate for the federal sovereign to muscularize the potency of the fourteenth amendment through selective repeal of the eleventh amendment, *see Fitzpatrick v. Bitzer, supra,* primacy of individual rights requires more than section 5 for full and lasting effectuation. Absent strong countervailing indications from Supreme Court cases, I would hold that in situations like the one before us, the fourteenth amendment of its own force has acted to repeal the eleventh amendment *pro tanto.*

As Judge Roney has demonstrated, however, such countervailing indications are not absent. The emanations from *Eldeman* and *Fitzpatrick* make it seem very unlikely that a majority of the present Supreme Court would sustain a holding that the fourteenth amendment, of its own force, represents a *pro tanto* repeal of the eleventh amendment. *Edelman*'s discussion of *Shapiro v. Thompson* [5] and prior summary affirmances must be seen as weighing heavily against the likelihood of such a holding.[6] Further,

declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation," *Great Northern Insurance Co. v. Read, supra,* 322 U.S. at 54, 64 S.Ct. at 877, *quoted with approval* in *Edelman v. Jordan, supra,* 415 U.S. at 673, 94 S.Ct. 1347. The "equitable restitution" argument is foreclosed by *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), as interpreted in *Edelman* and cited in *Fitzpatrick.*

**5.** 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

**6.** The concerns about *Edelman* expressed by Mr. Justice Stevens, concurring in the judgment in *Fitzpatrick,* seem apposite to my dilemma here:

Although I have great difficulty with a construction of the Eleventh Amendment which acknowledges the federal court's jurisdiction of a case and merely restricts the kind of relief the federal court may grant, I must recognize that it has been so construed in *Edelman v. Jordan,* . . . and that the language of that opinion would seem to cover this case.

—— U.S. at ——, 96 S.Ct. at 2673, 49 L.Ed.2d at —— (footnote and citations omitted). Once I have acknowledged, with Judge Roney, that the language of *Edelman* "would seem to cover this case," I am not so free as Justice Stevens, to argue that the language of *Edelman* should be read only in light of its narrow holding.

the concern in *Fitzpatrick* with the "threshold fact of congressional authorization," —— U.S. at ——, 96 S.Ct. at 2670, 49 L.Ed.2d at ——, *quoting Edelman v. Jordan, supra,* lends strong implicit support to the view that without that threshold fact, the strictures of the eleventh amendment are likely to be interpreted as absolute, under *Edelman.*[7]

When the Supreme Court's recent opinions have so firmly, if implicitly, indicated how a majority of the Justices would answer this important constitutional question, a court at this level is not free simply to note that the question is formally open and then to decide it contrary to those indications on the grounds of policy and the legislative history of the fourteenth amendment. Obeisant and submissive, then, as I must be to these emanations from the Supreme Court, I must join with Judge Roney in holding that, absent Congressional authorization, the current state of the jurisprudence precludes retroactive recovery of damages from the state treasury by an individual, even when that individual has proven that the state, to his damage, has violated his fourteenth amendment rights.

Having said all this, I also wish to emphasize that it is open for the Supreme Court to reverse our holding today without overruling any of its prior cases. As Mr. Justice Marshall noted, in dissent, in *Edelman* :

. . . [T]here has been no determination in this case that state action is unconstitutional under the Fourteenth Amendment. Thus, the Court necessarily does not decide whether the States' Eleventh Amendment sovereign immunity may have been limited by the later enactment of the Fourteenth Amendment to the extent that such a limitation is necessary to effectuate the purposes of that Amendment . . .

415 U.S. at 694 n. 2, 94 S.Ct. at 1371 n. 2, 39 L.Ed.2d at 690 n. 2. Indeed, the Court conceivably could find in the instant case, in which the "equitable restitution" argument seems strong, a narrow and most compelling situation in which the accommodation between the policies of the fourteenth amendment and the eleventh amendment must lie on the side of full potency of the fourteenth amendment.

Again, however, I must agree with Judge Roney that by far the strongest indications are that the ultimate accommodation reached by the present Supreme Court will not include any exceptions for situations in which the fourteenth amendment acts as a self-executing *pro tanto* repeal of the eleventh amendment's proscription on retroactive money recoveries from the states. Until the Supreme Court advises us otherwise, we must hold that the full remedies which might be implied under the fourteenth amendment require activation by Congress through section 5 legislation, or by a state herself through express waiver.

This most important issue may be frontally addressed and authoritatively resolved in *Rabinovitch* or in some other case in the near future. The question certainly merits direct and definitive Supreme Court attention. Through this concurring opinion, I sound a note of supplication that the Court might consider the wisdom of rejecting the implications of *Edelman* that we have

---

**7.** The following language from *Fitzpatrick,* also quoted by Judge Roney, suggests that the case was decided on the assumption that without section 5 legislation a state's eleventh amendment immunity under *Edelman* is impenetrable:

. . . We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. *See Edelman v. Jordan, supra; Ford Motor Co. v. Department of Treasury, supra.*

—— U.S. at ——, 96 S.Ct. at 2671, 49 L.Ed.2d at ——.

A Supreme Court decision that the fourteenth amendment acted as a self-executing *pro tanto* repeal of the eleventh would not necessarily render the *Fitzpatrick* section 5 holding superfluous, but would certainly diminish the importance of that holding. *Fitzpatrick* would remain significant in situations when the violation of Congressional Section 5 legislation did not necessarily constitute a violation of the fourteenth amendment itself. *Cf. Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

found controlling, and of holding that the eleventh amendment has been modified to the extent necessary fully to effectuate the sweeping mandate of the fourteenth amendment.